# WILLIAM EVERDELL *v.* JOHN LEE CARROLL ET UX.

[No. 478, September Term, 1974.]

*Decided April 3, 1975.*

The cause was argued before MOYLAN, MENCHINE, DAVIDSON and MELVIN, JJ.

*Roger D. Redden*, with whom were *Francis X. Wright* and *Robert R. Price, Jr.*, on the brief for appellant.

*Howard Wood* and *James D. Wright* for appellees.

MENCHINE, J., delivered the opinion of the Court.

Time was that the private lane commencing at Tilghman's Neck Public Road (now DeCoursey Thom Road) served without incident the 590 acre tract through which it ran to the farthest reaches of the land. Nor was its course impeded, save by farm buildings that forced in part a snake-like course, by intersecting lanes and by 90 degree turns. While the tract was singly owned, its users traversed the lanes in seeming harmony, their free passage unobstructed by gates, the speed of their travel limited only by the caution induced by its described design, by the screening effect of natural and planted trees and shrubs and by the signs posted by its owners to indicate its hazards. Unhappily, this harmony, this heaven's first law, changed to discord when the owners of the entire tract disposed of parts of the estate.

The entire tract, known as Blakeford Farm, had been in the ownership of Clarence W. Miles and wife (Miles). The southern and western borders of Blakeford Farm, in Queen Anne's County, Maryland, extended to the waters of Queenstown Creek and of the Chester River, respectively. By deed dated March 13, 1958, Miles conveyed to Potter a tract

of 18.113 acres situate and lying at the actual confluence of the two bodies of water at the southwest corner of the whole tract. That deed contained the following clauses:

> "TOGETHER with the buildings and improvements thereupon erected, made and being, and all and every the rights, roads, ways, waters, privileges, appurtenances and advantages to the same belonging or in anywise appertaining; and TOGETHER WITH the right of ingress to and egress from the above described property in common with the said Clarence W. Miles and Eleanor A. Miles, his wife, their assigns, the survivor of them, his or her heirs and assigns, over the private lane leading from the Tilghman's Neck Public Road into and through the farm building area of Blakeford Farm, and thence by a farm lane to the northerly end of a twenty-foot Right-of-Way surveyed by Shew & Bartlett on July 29, 1957, and thence by said twenty-foot Right-of-Way to the land hereinabove decribed and hereby conveyed." [1]

On June 15, 1970 Potter conveyed the entirety of the 18.113 acre tract to the appellant, William Everdell (Everdell). The latter deed contained the following clause:

> "TOGETHER with the buildings and improvements thereupon erected, made or being and all and every the rights, roads, ways, waters, privileges, appurtenances and advantages to the same belonging or in anywise appertaining; and especially together with the right of ingress to and egress from the above described property in common with Clarence W. Miles and Eleanor A. Miles, his wife, their assigns, the survivor of them, his or her heirs and assigns, over the private lane leading from the Tilghman's Neck Public Road by the route fully described in said deed; * * * "

---

1. Detailed description of the last mentioned right-of-way is omitted because it does not affect, save in a quite collateral way, the present dispute between the parties.

It was purchased at a cost of $185,000.00.

On June 30, 1970 Miles conveyed to appellee, John Lee Carroll [2] (Carroll) a 266.256 acre tract from the remaining acreage. That deed contained the following clauses:

"* * * TOGETHER with a perpetual easement of ingress and egress at all times by all means and for all purposes, upon, over and across the existing entrance lane thirty (30) feet wide leading from the public road now known as the DeCoursey Thom Road, formerly known as the Tilghman's Neck Public Road in a generally southerly direction to the real estate hereinabove described and hereby conveyed, in common with the said Clarence W. Miles and Eleanor A. Miles, his wife, their heirs and assigns.

SUBJECT NEVERTHELESS to the legal effect of the easements granted to Virginia B. Potter, her heirs and assigns, by the said Clarence W. Miles and Eleanor A. Miles, his wife, by deed dated March 13, 1958, and recorded among said land records in Liber T.S.P. No. 40, folio 23; * * *."

The Carroll tract enveloped all land boundaries of the Everdell tract, extending from Queenstown Creek to the Chester River.

The previously recited clause in the deed from Miles to Potter, coupled with that in the subsequent deed from Potter to Everdell, had the legal effect of making the remaining property of Miles and ergo, the property of Carroll, servient to the dominant right of Everdell to the extent of the interest thereby created and conveyed. *Desch v. Knox*, 253 Md. 307, 310, 252 A. 2d 815, 817.

In the subject litigation Everdell, owner of the dominant estate, sought to enjoin Carroll, owner of the servient estate, from maintaining allegedly unlawful obstructions within

---

2. By deed of even date, John Lee Carroll conveyed an undivided one-half interest in the tract to his wife, Cornelia T. Carroll. She was joined as a party defendant and is an appellee in this Court.

the right-of-way. The answer of Carroll admitted placement of "bumps" and barriers along the lane, but maintained in substance that they did not impinge upon Everdell's reasonable use of the lane and were within Carroll's dominion as reasonably necessary for his enjoyment of the fee through which the lane ran. The answer also alleged that Everdell was estopped to seek injunction because he had made "representations that he would join in such experimentation." Carroll also filed a counterclaim, alleging agreement by Everdell to relocate the 20 foot right-of-way leading from the Everdell property to the east-west leg of the farm lane. The trial court denied Everdell's claim for injunction and dismissed Carroll's counterclaim.

Although both Everdell and Carroll entered appeals from the decree of the trial court, the brief of Carroll declares: "The denial of the Counterclaim is not a subject of this appeal." Such denial will, accordingly, not be considered in this opinion.

We hold that the recited clause in the deed from Miles to Potter, *supra*, granted a right-of-way only. The deed evidenced a clear intent to retain in Miles such other rights or benefits of his fee simple estate as were not inconsistent with such grant.

In 1829 it was declared in *Bosley v. Susquehanna Canal,* 3 Bland 63, 67:

> "A right of way, whether public or private, is essentially different from a fee simple right to the land itself over which the way passes. A right of way is nothing more than a special and limited right of use; and every other right or benefit derivable from the land, not essentially injurious to, or incompatible with the peculiar use called the right of way, belongs as absolutely and entirely to the holder of the fee simple as if no such right of way existed. He is, in fact, for every purpose considered as the absolute owner of the land, subject only to an easement or servitude; he may recover the land so charged by ejectment; he may

bring an action of trespass against any one who
does any injury to it, not properly incident to an
exercise of the right of way; he has a right to the
trees growing upon it; to all minerals under its
surface; he may carry water in pipes under it; and
the freehold with all its profits, not inconsistent
with the right of way, belong to him."

There has been no departure from that rule of law. *Desch v.
Knox, supra.*

The deed from Miles to Carroll granted and conveyed by
metes and bounds description all the right, title, interest and
estate in the 266.256 acre tract, subject only to the
right-of-way previously granted by the Potter deed.
Contained within that description was that part of the bed of
the farm lane involved in the subject proceeding. Thus
Carroll became seized and possessed of the fee simple estate
therein except to the extent that the same had become
servient to the right-of-way previously granted by Miles to
Potter. All rights of Potter, of course, by mesne conveyance
had been granted and conveyed to Everdell.

We find that our decision is controlled by the rules of law
laid down in *Baker v. Frick,* 45 Md. 337. Although an action
at law,[3] *Baker v. Frick* is a leading case, applicable to and
cited with approval in injunction cases. This case first
enunciated in Maryland the rules of law under which the
respective rights of the owners of dominant and servient
estates are to be determined in disputes relating to
modification of rights-of-way. At page 340, *et seq.,* it was
said:

"The road in question is a private way over the
defendant's lands. 'Nothing passes as incident to
such a grant, but that which is necessary for its
reasonable and proper enjoyment.' 3 Kent, 419, 420.

"What is necessary for such reasonable and

**3.** The precise nature of the proceedings is obscure, the opinion stating at
page 338: "The case was docketed by consent, and all errors of pleadings and
questions of jurisdiction were waived by agreement."

proper enjoyment of the way granted, and the limitations thereby imposed on the use of the land by the proprietor, depends upon the terms of the grant, the purposes for which it was made, the nature and situation of the property subject to the easement, and the manner in which it has been used and occupied.

"As said by Marshall, C. J., in *Maxwell v. McAtee*, 9 B. Mon. 21, 'Notwithstanding such a grant, there remains with the grantor the right of full dominion and use of the land, except so far as a limitation to his right is essential to the fair enjoyment of the right of way which he has granted. It is not necessary that the grantor should expressly reserve any right which he may exercise consistently with a fair enjoyment of the grant. Such rights remain with him, because they are not granted. And for the same reason, the exercise of any of them cannot be complained of by the grantee, who can claim no other limitation upon the rights of the grantor, but such as are expressed in the grant, or necessarily implied in the right of reasonable enjoyment.'

"In that case it was decided that 'the grant of a right of way over or through the lands of an individual, does not imply that the grantor may not erect gates at the points, where the way enters and terminates.' That decision has been approved by courts of high authority in other States. *Bean v. Coleman*, 44 N. H. 539; *Garland v. Farber*, 47 N. H. 301; *Hoopes v. Alderson*, 22 Iowa, 161; *Bakeman v. Talbot*, 31 N. Y. 366, 370, 371; *Huron v. Young*, 4 Lansing, 63."

The Court added at 343:

"The questions whether under all the circumstances of the case, as disclosed by the testimony, the gates were necessary to the defendant for the useful and beneficial occupation

of his land, looking to the situation of his property; and whether the particular gates complained of, were usual and proper under the circumstances, and the further question whether their existence upon the road interfered with the reasonable use of the right of way by the plaintiff, considering the situation of his property and the manner in which it was occupied, and the interest of the parties as to the mode in which the right of way was to be used; these were all questions proper to be decided by the jury, upon the evidence in the case. On all these questions testimony was offered, legally sufficient to be submitted to the jury.

" 'The doctrine that the facilities for passage where a private right of way exists, are to be regulated by the nature of the case, and the circumstances of the time and place, is very well settled by authority. *Hemphill v. Boston*, 8 Cush. 195; *Cowling v. Higinson*, 4 M. & W. 245. The last case determines in effect, that the extent of the privilege created by the dedication of a private right of passage, depends upon the circumstances and raises a question for the determination of the jury.' *Bakeman v. Talbot*, 31 N. Y. 370. We refer also to *Hawkins v. Carbine*, 3 Exch. 914, and *Huron v. Young*, 4 Lansing, 64."

In substance, *Baker v. Frick* had stated the proposition that, *unless the terms of the grant itself prohibited such a course*, or the purposes for which the grant was made, and the nature and situation of the property subject to the easement and the manner in which it has been used and occupied, implied such prohibition, the installation of a gate at the *terminii* of the right-of-way would be permissible if:

1. Its installation was necessary for the useful and beneficial occupation of the land of the servient estate; and

2. The particular gates complained of, were usual and proper under the circumstances; and

3. The installation did not interfere with the reasonable use of the right-of-way by the dominant estate.

We address ourselves to the threshold question, namely, whether the right of the servient owner *to make any modification of the right-of-way* is prohibited either by the specific terms of the grant or by necessary implication.

The granted right-of-way did not in express terms deprive Carroll of the right to erect gates and thus did not expressly grant to Everdell an open road without gates. The purpose for which the grant was made is apparent from its very terms, namely, "the right of ingress to and egress from the [Everdell] property in common with the [fee owner]."

The nature, situation, use and occupation of the property subject to the easement at the time of its creation, however, is not capable of such easy definition. That part of the total right-of-way with which the present litigation is concerned was not the subject of a metes and bounds description, the document of its creation delineating it merely as a "private lane leading from the Tilghman's Neck Public Road into and through the farm building area of Blakeford Farm and thence by a farm lane to [a fully described twenty foot right-of-way].[4] The lane, replete with 90° turns, literally divided the Miles (now Carroll) tract into segments of various shapes and sizes. Movement, either afoot or by vehicle, from segment to segment of the servient estate, compelled continuing passage along or across its irregular route by its owner in the daily use of the lands through which it passed. Numerous dwellings, garages, sheds, silos and other farm buildings in close proximity to the lane were in such positions along its serpentine course that their utilization compelled movements into, across and along its path.

We are persuaded that a *necessary* modification of the right-of-way by the owner of the servient estate was not

4. The fully described right-of-way leading from the last mentioned farm lane to the Everdell residence has undergone no change. It thus plays no part in this aspect of the litigation. It does bear collaterally upon an alleged estoppel urged by Carroll. This will be discussed *infra.*

explicitly or implicitly forbidden by the grant in the subject case. This conclusion simply means that the threshold requirement of *Baker v. Frick* has been met and we are required to pass to the elements essential to the application of its doctrine, namely, whether the evidence shows: (a) that modification of the right-of-way was necessary for the useful and beneficial occupation of the servient estate; (b) that the installations were usual and proper under the circumstances; and (c) that the installations did not interfere with the reasonable use of the right-of-way by Everdell.

Both Everdell and Carroll had rented their respective homes for about two years prior to their purchase. No traffic devices had been installed during that period. There was testimony to the effect that speeding vehicles on the lane had been a problem since 1956 with three or four accidents. None of the accidents had occurred at the points where "bumps" or barricades had been placed by Carroll. Both Carroll and Everdell are seasonal users of their respective properties.

The installation by Carroll of a series of "bumps" was a forerunner to the subject litigation. Although their installation initiated the Carroll-Everdell dispute, no substantial role was played by the "bumps" in continuing complaints by Everdell against Carroll or in the testimony of the witnesses. Indeed, the record tends to suggest that a decrease in the elevation of the "bumps" had created conditions whereby they no longer presented objectionable deterrent to the movement of traffic.

While the dispute concerning the "bumps" was raging between Everdell and Carroll and their respective counsel, discussions turned to possible use of some type of barricade to accomplish speed reduction of vehicles using the lane, in lieu of the "bumps". Everdell acknowledged such discussions, but protested vehemently when Carroll, without further notice, caused to be constructed and installed six gate-like wooden barricades, each approximately of the same size and shape, with a length approximately one half the width of the lane. The six partial barricades were set up in three pairs. These pairs, described by the witnesses as

barricades 1, 2 and 3, were installed in the lane in that progressive order from the direction of the public road toward the Everdell property. Placed on opposite sides of the lane, each half-gate of the pair would be set up at varying distances from its companion. We have reproduced a portion of plaintiff's Exhibit D showing the passage of the lane through the Carroll property with locations of the "bumps" and barriers indicated upon it.[5]

Barricade No. 1 was set up at a point where the lane began its passage through the first turn in the farm building area, with its first barrier being set up on the north side of the lane and the other barrier set up at a point near the stable on the opposite side. The outer wings of the respective barriers were 24 feet apart.

Barricade No. 2 was installed at the southernmost end of the farm building area with its first barrier placed at a point in the lane near the side of a garage and the other barrier set up beyond it on the opposite side. The outer wings of the respective barriers were 25 feet apart.

Barricade No. 3 was set up along the east-west course of the lane with its first barrier placed on the south side of the lane in approximate line with a hedge row 6 feet high at the end of a field planted in corn. Both the hedge row and the growing corn served to restrict visibility at the point. Its second barrier was placed on the opposite side of the lane in front of a garage or tool shed and shop. The outer wings of these respective barriers were 20 feet apart. For reasons that will hereafter become manifest, barricade No. 3 is at once the principal vexation of Everdell and the indispensable requisite of Carroll. The separate wings of barricade 3 are the closest of any. We have reproduced, in part, plaintiff's Exhibit D-3, a plat showing the point of placement in the lane.[6]

The barricades initially were constructed in the form of half gates standing upon small attached platforms at either end. Later the first two barricades were hinged to metal

---

5. Attached hereto in Appendix.
6. Attached hereto in Appendix.

rods inserted in pipes driven into the ground at or near the edge of the road. The third barricade was hinged to wooden posts but installed in such a way that swinging movement was limited by copper tubing so fixed upon the barrier that it could be moved up or down into or out of a pipe sunk into approximately the center of the right-of-way.

Carroll's reasons for the placement of the "bumps" and barricades are substantially fully articulated in the following quotation from his testimony:

> "We gave this a good deal of thought and decided there were three real bad places, one at this corner of the farm yard, at the south corner of the farm yard, and in this work shed area just north of our house, those seem to be the three main danger points. The reason for the latter was cars would come out here at the north end of Mr. Everdell's described right-of-way and they would build up whatever, according to the type of car they had, whatever speed they could and really come in this turn with quite a bunch of speed. All of a sudden there was a very straight road and a very settled area and we felt we had to have some way of slowing them down at this place."

In further reference to barricade No. 3 Carroll said: "In order to get from our house to any main enjoyment of our living area of the farm we have to cross this road, and we do it continually."

Motion picture films showing the movement of vehicles through the several barricades formed part of the evidence presented in the trial court. Those films were shown also in this Court during the argument on appeal. The films showed the movement of: (a) a passenger vehicle and (b) a truck through the barricades in each direction. Such movements could be made at slow speed through barricades 1 and 2 without leaving the established course of the lane, although those barricades did occupy a portion of the bed of the existing lane. The passage of the vehicles through barricade 3 could be accomplished only at slower speed and by leaving

the established course of the lane. The trial judge described this condition as follows:

> "The film shown by Defendant of this area [Barricade No. 3] indicates a modest weave of a vehicle of less than 50 degrees for a distance of less than 25 feet."

Our view of the films indicated that the vehicles shown were compelled to leave the established lane and to encroach upon the lands of Carroll, the truck to a greater extent than the passenger vehicle.

Everdell summarized his basic objection to the barricades as follows: (1) they forced vehicles to leave the established way; (2) they operated to delay heavy equipment that could produce very serious harm or inconvenience; (3) they may not be movable in the event of snow; (4) they forced motor vehicles onto the wrong side of the lane, thereby placing them in the path of oncoming traffic, and (5) at night, people unfamiliar with their existence were endangered by their presence.

Leonard Yates, a realtor, testifying as an expert witness for Everdell, said that the "bumps" and barricades reduced the value of the Everdell property. He explained that prospective purchasers would ask themselves, "If this can be constructed what else can be done to this right-of-way?" He said that close inquiry normally is made by prospective buyers about rights-of-way. On the other hand, Robert Sharp, a real estate broker called by Carroll, testified that in his opinion the "bumps" and barricades had no depreciating effect upon the value of the Everdell property. The rhetorical question asked by Yates points up the dangers inherent in unilateral modification of a right-of-way particularly here, where it is conceded that actual collisons have occurred on other parts of the lane but never within the areas of the subject modifications.

Two witnesses, one the Chief of Police of Centreville, called by Everdell, thought that barricade No. 3 would constitute an added danger because of its screening effect

upon the movement of small children across the lane. No other lane in Queen Anne's County had such barricades.

The garbage truck could pass through the barricades only by swinging them upon their hinges. The fire chief of the nearby Volunteer Fire Department testified that fire equipment consisting of an "aerial platform" and an "800 gallon pumper" went through the first two barricades "without much difficulty, the third one we did have to slow down and move the gate."[7] He doubted whether the tank wagon and the tractor trailer of the fire department "could get through that barn area * * * even without the gates there."

That the trial judge gave great weight to the testimony of Steven D. Peterson, an expert witness produced by Carroll, is apparent from this excerpt of the court's opinion:

---

**7.** The record shows the following testimony concerning barricade 3 as it existed at the time of trial:

"'Mr. Carroll has just modified the final set of barricades by swinging them on posts and hinges so that they swing very freely. Each of these gates is held in place in the roadway by a short piece of three-eighths inch copper tubing inserted through a staple on the gate into a pipe socket in the ground. It would take hardly any force to break any such tubing. Therefore, Mr. Carroll wanted me to notify you that the fire truck should just bump the gate open without any need to stop and lift it aside as formerly.'

Q. Now, assuming the description in my letter is accurate in this final modification this would mean, would it not, that your equipment could go all the way to Mr. Everdell's house without having to stop, is that right?

A. That is correct."

The trial court then inquired:

"THE COURT: What would be the effect of a snow on this Mr. Starkey?

THE WITNESS: I would say we would have to stop and open them up if it was any amount at all.

THE COURT: In the meantime, the Everdell's house could burn down?

THE WITNESS: If we couldn't get there, this is true, right."

The ancient manor house on the land had been destroyed by fire in 1970 during the ownership of Miles.

There was other evidence that it was the imposed duty of a tenant farmer engaged by both Carroll and Everdell, to keep the lane clear of snow and that the barriers furnished no impediment to its removal.

"The Court also places great weight and confidence in the testimony of Steven D. Peterson, a traffic engineer who qualified as an expert in the field, employed by the Carrolls to make a study of the right-of-way and recommend traffic control devices for the safety of those residing on the property and all who use the right-of-way.

"Mr. Peterson stated that Defendants were warranted in their fear of traffic accidents at two blind zigzag corners where traffic might go 25 m.p.h. if not slowed; and also there is a danger spot in the area of the machinery shed. This is a $^3/_{10}$ mile straightway that traffic could approach at a high rate of speed unless controlled in some manner.

"Mr. Peterson recommended the traffic controls now in use and feels that they are proper to control the traffic in the areas considered dangerous on the right-of-way. He also recommended warnings to the public of the location of the barricades, as well as trimming of the shrubbery where it might obscure parts of the roadway for travelers.

"Mr. Peterson also stated that there had been no substantial number of accidents, but close calls; and that he estimated there were not over 100 vehicles a day on the property, around 30 in the farm building area, and around 5 to 7 go through and use the third barricade."

Although *Baker v. Frick* dealt with a case involving gates placed at the *terminii* of the right-of-way, we do not limit application of its rule to such cases. Indeed, in *Frank v. Benesch*, 74 Md. 58, 21 A. 550, where the Court approved modification along the course of the right-of-way by the owner of the servient estate, *Baker v. Frick* was cited with approval. Nor is there any doubt that the rule of *Baker v. Frick* continues viable. It was cited with approval in *Simon Distributing Corp. v. Bay Ridge Civic Association*, 207 Md. 472, 114 A. 2d 829, and in *Reddick v. Williams*, 260 Md. 678, 273 A. 2d 153, although the right of the servient estate to

modify the right-of-way was denied in both. It was denied in *Simon* because the proof did not even meet the threshold question — the purpose of the grant itself implied a prohibition against gates. It was denied in *Reddick* because the installation of a gate interfered with the reasonable use of the right-of-way by the dominant estate.

In the subject case the trial judge, declaring that he was "impressed by the manner and seriousness with which Mr. Carroll * * * addressed himself to the dangerous traffic problem on the right-of-way" found that Carroll "has not done anything unreasonable in making an effort to control traffic on the right-of-way through his 266+- acre property, for the protection of those living there as well as others using the right-of-way," and "that the offset barricades are not an unreasonable interference with plaintiff's right of common use of the right-of-way for ingress and egress and are necessary for the safe and normal use of the right-of-way by defendants and others." Determination of those questions where the facts are in dispute, is a matter for the trier of facts. *Baker v. Frick, supra,* at 343; *Gillett v. Van Horne,* 36 S.W.2d 305 (1931 Tex. Civ. App.); Annotation, 52 A.L.R.3d 9, *et seq.* We cannot say that the conclusion of the trial judge is clearly erroneous as to barricades no. 1 and no. 2. Maryland Rule 1086.

Barricade no. 3, however, stands in a different legal position. The testimony is uncontroverted that in the movement of vehicles through the barriers forming this barricade, they are compelled to leave the established right-of-way. A right-of-way may not be relocated without the consent of the owners of both the dominant and servient estates. *Millson v. Laughlin,* 217 Md. 576, 588, 142 A. 2d 810, 816.

We hold accordingly, that the appellant is entitled to an injunction requiring removal of barricade no. 3 in its present form unless barred by estoppel.

### Estoppel

Carroll urges that in any event, Everdell is estopped by conduct from obtaining the relief he seeks. Conversations

and correspondence concerning the right-of-way had been carried on between Carroll and Everdell and their respective counsel. Initially they related to protests by Everdell because Carroll had installed, without prior agreement, two "bumps" in the area of the farm buildings. Everdell's objections were disregarded and additional "bumps" were installed by Carroll in the east-west section of the lane after notice to, but again without the consent of Everdell. The latter installation infuriated Everdell because of the severe jolting effect upon vehicles and their passengers upon approaching and leaving his dwelling. The "bumps" were scaled down following meetings between Carroll and Everdell, but even then were left at an elevation regarded as too high by Everdell. Everdell continued to protest. Meetings followed at which discussions were had concerning introduction of a new right-of-way to eliminate the need for the "bumps." As heretofore stated, Carroll did not press his appeal from the decree rejecting his claim that agreement upon a new right-of-way had been reached by the parties. It was during such meeting that experimentation with barricades was discussed. The trial judge said that he could not find that the parties had reached a meeting of the minds on an agreed location for barricades. We cannot say that his conclusion was clearly erroneous. Rule 1086.

*J. F. Johnson Lumber Co. v. Magruder*, 218 Md. 440, 147 A. 2d 208; *Vogler v. Geiss*, 51 Md. 407; and *Millson v. Laughlin*, supra, all cited by the appellees on the estoppel issue, do not aid them. In *Johnson*, the Court declared at 448 [212] that the doctrine "* was educed to prevent the unconscientious and inequitable assertion of rights or enforcement of claims which might have existed or been enforceable, had not the conduct of a party, including his spoken and written words, his positive acts and his silence or negative omission to do anything, rendered it inequitable and unconscionable to allow the rights or claims to be asserted or enforced." Everdell's protests, early and late, negate estoppel. He had expressed willingness to negotiate, but this seems to have been followed only by unsatisfactory unilateral action presenting him with a *fait accompli.* In

*Vogler*, the Court reversed because evidence tending to show agreement to an easement change had been ruled inadmissible. That case offers no guide to our decision. In *Millson*, (589 [817]) the record showed that "[t]here was evidence from which the conclusion could be drawn that the defendant had abandoned the old road when she never used it after acquiescing in the construction of the new straighter road and had never protested the closing of the old road." All are patently distinguishable from the subject case. Here there was a mere agreement to experiment. We urge continuation of experimentation in efforts to reach agreement. We can find in this record, however, no action or inaction by Everdell such as operated to bar his right to claim relief in the subject litigation.

> *Reversed in part and affirmed in part and case remanded for issuance of an injunction as to barricade No. 3.*
> *Costs to be divided.*