H. William and Lily Y.
TANAKA, Appellants,

v.

John E. and Jean McEvers
SHEEHAN, Appellees.

No. 90–644.

District of Columbia Court of Appeals.

Argued Feb. 12, 1991.

Decided April 12, 1991.

C. Francis Murphy, Washington, D.C., for appellants.

Howard H. Stahl, with whom Steven K. Davidson and Mark A. Moran, were on the brief, Washington, D.C., for appellees.

Before ROGERS, Chief Judge, and TERRY and FARRELL, Associate Judges.

ROGERS, Chief Judge:

This appeal arises out of a dispute between residential property owners with respect to a fifteen foot ingress and egress easement that runs over part of appellants' property for appellees' benefit. Appellants sought to put a gate across the width of the easement at its western end and a fence (with gates) along the length of the easement adjacent to appellees' property. Appellees obtained a temporary restraining order, and thereafter a permanent injunction, to prevent appellants from constructing any gate or fence. We reverse and remand.

I

Appellants Tanakas are the owners of lot 50 in Square 2154, located at 3246 S Street, N.W., Washington, D.C. (servient estate). Appellees Sheehans are the owners of lot 804 in Square 2154, located at 3247 R Street, N.W., Washington, D.C. (dominant estate).

In 1927, the owners of lot 50 granted the owners of lot 804 a right of way for ingress and egress over a tract in the southwest part of lot 50. The easement leads to a public alley, which, in turn, leads to S Street, and thereby provides direct access to S Street from the rear of lot 804. When appellees acquired lot 804 in 1972, the deed conveyed to them "a right of way for the purpose of ingress and egress" over an area of lot 50 that was fifteen feet in width (hereinafter referred to as the easement area). [See Appendix]

There are no gates or fences in the easement area, and it has never been obstructed in any way. There are two gates on appellees' property which are at the border of the easement. One gate is wide enough for motor vehicles to pass through; the other is far narrower and for pedestrian use. Appellees have used the easement for a variety of purposes over the years, principally to accommodate deliveries to the rear of their property. Thus, the gardener, pool maintenance personnel and caterers have used the easement area to gain entry onto appellees' property because the areas on either side of the house are very narrow.

Although appellees have not used the easement in order to park their car in a garage located at the rear of their property, they have plans to construct a new garage for future use at the same location as the present garage.

Appellants, who purchased lot 50 in 1978, retained an architectural firm in 1985 to prepare plans for the construction of a gate and a fence in the easement area. They were motivated by concerns about security, and wanted to have a physical barrier between their property and the public alley. The architect's plans called for construction of a gate across the western area of the easement blocking the public alley and a fence, with gates, along the southern boundary of their property that abuts the easement area.[1] The structures upon which the western gate was hung would extend three and one-half feet into the easement area. The fence would occupy from three and one-half to three and three-quarter inches of the easement area. To maintain the easement at its current size, appellants moved the southern boundary of their perimeter wall four and one-half inches north; thus, the usable easement area would be from three quarters of an inch to one inch greater than it is presently.

Appellants engaged appellees in discussions about their plans and proposed to modify them in response to certain of appellees' concerns.[2] Initially appellants had planned to install locks on the western gate and furnish keys to appellees. They modified their plan when appellees expressed concern about personal security if they were required to get out of their car to unlock the gate. The new plan provided for the installation of an electronically operated gate. Appellants would furnish appellees with four remote control units which they could disburse to delivery people, and if they desired, additional units would be furnished. On November 13, 1989, appellants began constructing the

fence (with gates) and gate in the easement area. Appellees thereafter obtained a temporary restraining order, and trial on their request for a permanent injunction began on January 10, 1990.

At trial appellants presented testimony that they were willing to modify their plans in the event that the judge found that an electronically locked gate would unreasonably interfere with appellees' use of the easement. In that event, appellants proposed to install an unlocked gate with latches that could be opened from the inside or outside. The trial judge permanently enjoined appellants from

> installing ... a fence, gate or any other kind of obstruction, structure, or impediment over, across, in or on any of the space reserved for the easement owned by [appellees], * * * and [from] modifying, altering or otherwise affecting in any way the area reserved for the easement owned by [appellees]; and [ ] otherwise taking any action to interfere with, impede or hinder [appellees'] right to the unfettered ingress and egress over, across, on or through the easement area.

The trial judge concluded first, that the gate and the fence (with gates) impermissibly encroached upon the easement and, under *Fields v. District of Columbia*, 143 U.S.App.D.C. 325, 443 F.2d 740 (1971), violated appellees' rights, and second, that the gate at the western end of the easement unreasonably interfered with appellees' unrestricted right of ingress and egress. The judge reasoned that here, as in *Preston v. Siebert*, 21 App.D.C. 405 (1903), a locked gate would provide a severe inconvenience to appellees since "[t]radesmen wishing to introduce goods through the right of way would have to first come to the front of the house to secure the control device to open the gate[ ]."

The judge denied appellants' motion to amend the judgment, although he amended his findings to address specifically appel-

---

1. Appellants had constructed a brick wall on the eastern, western and southern sides of their property, outside the easement area.

2. The trial judge noted appellants' "good faith efforts [ ] to resolve this matter through negotia-

tions," and his regret that the parties, assisted by able counsel, were not able "to settle th[e] case in a manner that recognizes each sides [sic] substantial rights in the premises which should be respected."

lants' testimony that they would, as an alternative to the electronically-controlled gate, install a "gate[ ] with latches that would be unlocked and openable from either side." The judge found that an electronically-controlled gate risked unauthorized access to both parties' premises, and consequently would not enhance security, and "more importantly [that] the required coordination of delivery and return of the control units would ... constitute an unreasonable and substantial interference with [appellees'] rights." He viewed the alternative proposal for an unlocked latched gate to be "a proposal nothing more nothing less." The judge added that "this proposed gate without more does not persuade the Court that [appellees'] right of access would not be unreasonably restricted," noting that it was unclear whether the latches could be designed to prevent appellees from locking them from the inside, and that in any event the gate would diminish appellees' "right of unfettered access over the entire fifteen foot easement area guaranteed by [appellants'] deed."

## II

On appeal appellants contend that the trial judge misapplied *Fields v. District of Columbia, supra,* 143 U.S.App.D.C. at 325, 443 F.2d at 740, that he did not look to the intent of the grantor, and that his findings that the western gate would unreasonably or in any substantial way interfere with the use of the easement are clearly erroneous.

### A

Appellants maintain that the trial judge mistakenly interpreted *Fields* to mean that the owner of the servient estate is absolutely forbidden as a matter of law from interfering with or physically modifying the precise area reserved by deed for the easement. They argue that *Fields* is consistent with the universally followed rule that the servient owner may erect gates and fences at the points and boundaries of the easement unless: (1) the terms of the grant itself or the circumstances surround-

ing its execution would prohibit such constructions, or (2) the fences or gates unreasonably interfere with the right of passage. We agree that the trial judge misapplied *Fields,* viewing it as establishing a rule of law without reference to the language of the deed and the circumstances surrounding creation of the easement.[3]

In *Fields* the dominant estate holders' predecessors in interest had been granted an easement over a sixteen foot roadway. 143 U.S.App.D.C. at 327 n. 1, 443 F.2d at 742 n. 1. The original deed conveyed a "private roadway leading to said Nichols Avenue and *for no other purpose whatever* reserving [ ] to the [dominant estate holders] the *full* right of way use and benefit ... as a roadway." *Id.* (emphasis added). The servient estate holder proposed to widen the roadway to twenty-three feet in order to provide access to parking facilities for an adjoining apartment complex which he was constructing and to provide parking for seven cars on the roadway. *Id.* at 327, 443 F.2d at 742. The court held, ruling in favor of the dominant estate holders, that in view of "the language of the reservation which creates [the] easement, all [the dominant estate holders] could reasonably expect [was] that the entire sixteen feet would continue to be available for [their] use as a roadway." *Id.* at 329, 443 F.2d at 744. The servient estate holder's proposals, the court concluded, were expressly prohibited by the language of the deed since the roadway would be changed into a parking lot over the objection of Fields and other residential lot owners. *Id.* at 330, 443 F.2d at 745. The court's conclusion was not based on an abstract determination that any encroachment or modification of the easement was a violation of the easement rights, but on a careful consideration of the terms of the 1875 deed and the location of the parties' properties:

> The nature of the dominant interest in an easement created by deed is quite logically to be determined by the terms of the document creating it, at least in

3. *Community Credit Union v. Federal Express Servs.,* 534 A.2d 331, 334 (D.C.1987) (question of law subject to de novo review); D.C.Code § 17–305 (1989).

the first instance. \* \* \* [The proposed modifications] would be in derogation of the easement as originally reserved in the deed. \* \* \* [They] would take away appellants' rights in a "roadway" without their agreement and contrary to their desires and substitute an easement they do not desire. Such a decree crosses the boundaries of equitable relief and the relief amounts to the reordering of property rights between private parties. The appellants are entitled to preserve their right to use or not to use the precise strip abutting their lots as a private roadway and are not required to submit to a substitution of some other location or arrangement which the trial judge considered to be similarly advantageous.

*Id.* at 329–40, 443 F.2d at 744–45.

██ *Fields* thus does not depart from the universally held rule[4] that absent a contrary intent, the servient owner may erect gates or fences provided they do not unreasonably interfere with the right of passage.[5] The court's holding was based on its reading of the language of the 1875 deed and review of the circumstances of the location of the lots owned by Fields and other residential lot owners. The analysis in *Everdell v. Carroll*, 25 Md.App. 458, 465, 336 A.2d 145, 150 (1975), in accord with many jurisdictions,[6] is instructive:

> *unless the terms of the grant itself prohibited such a course*, or the purposes for which the grant was made, and the nature and situation of the property sub-

ject to the easement and the manner in which it has been used and occupied, implied such prohibition, the installation of a gate [or fence] would be permissible if:

> 1. Its installation was necessary for the useful and beneficial occupation of the land of the servient estate; and
> 2. The particular gates complained of were usual and proper under the circumstances; and
> 3. The installation did not interfere with the reasonable use of the right-of-way by the dominant estate.

(Emphasis in original).

██ In the instant case, the trial judge failed to address the threshold issue of whether the terms of the deed and the circumstances surrounding its execution permit the servient owner to place a gate and fence on the easement. Under *Fields*, the judge should first have determined whether the right of appellants (the servient owners) to make modifications is prohibited by the terms of the deed granting the right of way or by implication from the circumstances at the time of its creation. Only then should the judge have considered whether the gate and fence (with gates) were usual and proper under the circumstances. Instead, the judge concluded as a matter of law that appellees had a "right of unfettered access over the entire fifteen foot easement area guaranteed by [appellants'] deed," without first considering the

---

4. *See, e.g., Hall v. Clayton*, 270 Ark. 626, 606 S.W.2d 102 (Ct.App.1980); *Pion v. Dwight*, 11 Mass.App.Ct. 406, 417 N.E.2d 20 (1981); *Simon Distrib. Corp. v. Bay Ridge Civic Ass'n*, 207 Md. 472, 114 A.2d 829 (1955); *Houghtaling v. Stoothoff*, 259 A.D. 854, 19 N.Y.S.2d 510 (1940); *Setzer v. Annas*, 286 N.C. 534, 212 S.E.2d 154 (1975); *Dyba v. Borowitz*, 136 Pa.Super. 532, 7 A.2d 500 (1939); *Waskey v. Lewis*, 224 Va. 206, 294 S.E.2d 879 (1982); *Rupert v. Gunter*, 31 Wash.App. 27, 640 P.2d 36 (1982); 25 Am.Jur.2d *Easements and Licenses* § 91, at 497 (1966) ("[g]enerally, the grant of a way without reservation of the right to maintain gates does not necessarily preclude the owner of the land from having them"); 28 C.J.S. *Easements* § 98, at 781 (1941) ("[t]he grant of a way without any reservation of a right to maintain gates does not necessarily imply that the owner of the land may not do so").

5. *Preston v. Siebert, supra*, 21 App.D.C. at 405, the only other decision in this jurisdiction addressing the issue of interference by the servient estate owner with a right of way easement, also supports appellants' position here. In *Preston*, the specific issue was whether the erection of gates at the boundary of the easement was an unreasonable interference. 21 App.D.C. at 414. The court would not have had to reach this issue if the rule was that any encroachment or obstruction unreasonably interferes with the easement as a matter of law.

6. See, *e.g., Jordan v. Guinn*, 253 Ark. 315, 319–23, 485 S.W.2d 715, 719–20 (1972); *Fortner v. Eldorado Springs Resort Co.*, 76 Colo. 106, 118, 230 P. 386, 391 (1924); *Mann v. Phelps*, 269 Ky. 493, 496, 107 S.W.2d 288, 290 (1937); *Brown v. Gaskins*, 284 S.C. 30, 32, 324 S.E.2d 639, 640 (Ct.App.1984); *Wykoff v. Barton*, 646 P.2d 756, 758 (Utah 1982).

language of the deed and the circumstances of the creation of the easement to determine whether the intent of the creators of the easement was to prohibit the construction of a gate and fence (with gates). In so doing the judge misapplied *Fields.*

■■■■ Given the location of the easement and the location of the parties' properties, it is clear that the words in the deed created a right of access to the rear of appellees' property from the public alley off of S Street.[7] The language of the deed only provided a "right of way for the purpose of ingress and egress." A grant of a right of way for ingress and egress without any limiting language does not prevent the servient owner from constructing gates or fences. *See, e.g., Everdell, supra,* 25 Md.App. at 465, 336 A.2d at 151 ("right of ingress to and egress" does not deprive servient estate holder of right to erect gates); 28 C.J.S. *Easements, supra* note 4, § 98, at 781 (intent to restrict servient owner where grant states that the way shall be "open," or "without gates"). Accordingly, all appellees could reasonably expect was that they would be able to use the easement to gain egress and ingress to their property. *Fields, supra,* 143 U.S.App.D.C. at 329, 443 F.2d at 744. A gate or fence is not inconsistent with this purpose.

■■■■ The reference in the easement to a fifteen-foot area does not, as appellees insist, prohibit any encroachment in the easement area. The measurements merely describe the area for identification purposes and do not evidence an intent to grant a right of use of the full fifteen feet. The right of way reserved in appellees' deed provides for a bare right of way; it contains no reservation of the "free right of way," as in *Flaherty v. Fleming,* 58 W.Va. 669, 52 S.E. 857 (1906) (deed held not to permit obstructions), or a requirement that the easement area not be "incumbered in any way," as in *Mineral Springs Mfg. Co. v. McCarthy,* 67 Conn. 279, 34 A. 1043 (1896) (construction of a gate barred). Furthermore, the record does not reveal any circumstances that would suggest that in 1927 the grantor intended that a gate and fence could not be constructed in the easement area; to the contrary, the record suggests that the intended use of the easement—access to the rear of appellees' property—is compatible with an appropriate gate and fence.

## B

■■■ Appellants further contend that the trial judge's findings that the western gate would unreasonably interfere with appellees' right of ingress and egress are clearly erroneous and not supported by the evidence.[8] They maintain that the judge failed to balance the rights of the parties in the easement, instead interpreting appellees' rights to dominate in a manner that was inconsistent with the assertion of any rights by appellants in the easement area. Appellants also maintain that the trial judge misinterpreted *Preston v. Siebert, supra,* 21 App.D.C. at 405, to establish a per se rule where a delivery person is required to go to the front of the house before gaining access to the easement and erred in concluding that the factual differences in *Preston* and the instant case were of no significance and, therefore, the proposed gate impermissibly interfered with appellees' right of way.

■■■ Although the decisions in this jurisdiction have not had occasion to set forth the analysis that is required when parties assert their rights in the easement, it is clear that in determining the reasonable-

7. At oral argument appellants' counsel advised that the record was complete with regard to events in 1927 and the use of the easement area since that time. Appellees' counsel did not disagree. Hence, there is nothing to preclude this court from determining the original intent of the grantor of the easement. *See Fields, supra,* 143 U.S.App.D.C. at 329, 443 F.2d at 744.

8. Whether the gate unreasonably interfered with the right of way is a question of fact, *Preston v. Siebert, supra,* 21 App.D.C. at 414; *Everdell, supra,* 25 Md.App. at 465, 336 A.2d at 150; 2 J.S. GRIMES, THOMPSON ON REAL PROPERTY § 431, at 690 (1980 repl.), and will not be disturbed on appeal unless it is clearly erroneous or without evidence to support it. *See, e.g., Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543 (D.C.1981); D.C.Code § 17–305 (1989).

ness of placing a gate across an easement, a balancing test must be applied to weigh the interests of the dominant and servient estates in the easement. *See Everdell, supra,* 25 Md.App. at 465, 336 A.2d at 150; *Stucchi v. Colonna,* 9 Mass.App. 851, 852, 400 N.E.2d 1272, 1273 (1980); *Thomas v. Mitchell,* 287 S.C. 35, 37, 336 S.E.2d 154, 155 (Ct.App.1985). Thus, consideration of whether the gate is usual and proper under the circumstances and the servient owner's need for the gate must be balanced against the extent of the interference with the reasonable use of the right of way by the dominant estate holder:

> The owner of a servient estate may place gates across an easement so long as the gates are 'necessary for the enjoyment of his property, and are not so numerous and of such size and construction as to constitute an unreasonable burden on the right of way.'

*Thomas, supra,* 287 S.C. at 38, 336 S.E.2d at 155 (quoting *Watson v. Hoke,* 73 S.C. 361, 364, 53 S.E. 537, 538 (1906)).

 In the instant case the trial judge did not engage in this kind of balancing of interests, but instead viewed the dominant estate holders' rights as encompassing virtually absolute control over what happened in the easement area. In substantial part, this may have stemmed from the judge's erroneous interpretation of *Fields.* We conclude, therefore, that a remand is required for the trial judge to engage in the appropriate balancing uninfluenced by the erroneous conception that any encroachment in the easement area was forbidden.

There is nothing in the judge's opinion to indicate that he addressed the legitimate interests of the servient estate owners in the easement area. The judge made no findings whether the western gate was nec-

essary for the benefit of the servient estate despite testimony that the proposal for construction of the gate was motivated by concern about the security of appellants' property. This concern was not vitiated by the fact that appellants, as an accommodation to appellees, offered to install latches on the gate that could be unlocked from either side. Indeed, an important consideration requiring a remand is our disagreement with the trial judge that the offer of an unlocked gate (which, as a visible deterrent to entry, would still afford appellants additional security) was a "proposal[,] nothing more nothing less"—in effect too little too late. Appellants testified that the latches would be kept unlocked on both sides and that appellants would properly be subject to being held in contempt if they attempted to lock them; implicit in this was a concession that the trial judge could enjoin appellants from locking the latched gates from within. Given the judge's own commendation of appellants' "good faith efforts [ ] to resolve this matter through negotiations," note 2, *supra,* the judge was obliged to treat seriously the proposal for unlocked gates before rejecting appellants' effort to improve the security of their own property.

Nor do we agree with the trial judge that "*Preston [v. Siebert]* decides this case." That decision acknowledged the right of a servient landowner to erect a gate as "a reasonable protection to property" provided it did not "unreasonably or in any substantial manner interfere with the use of the right of way [for ingress and egress]." 21 App.D.C. at 414.[9] A fence and a gate that were unreasonable in the preelectronic age when *Preston* was decided may not be unreasonable today when alternate means are available to insure access consistent with

---

**9.** The *Preston* court stated:

> Every case probably depends upon its own circumstances, and usage and custom undoubtedly have much to do with the question of reasonableness of an apparent obstruction. Every gate over a right of way is to a greater or less [sic] extent an obstruction; but if the circumstances are such that it constitutes no more than a reasonable protection of proper-

> ty, which all the parties might well be supposed to have anticipated when the right of way was created, and if it is such an obstruction as does not unreasonably or in any substantial manner interfere with the use of the right of way, a gate should not be regarded as an unlawful impediment to the owner's enjoyment of such right of way.

21 App.D.C. at 414.

the valid security concerns of the property owner.[10] *See Hall v. Clayton, supra* note 4, 270 Ark. at 626, 606 S.W.2d at 102 (unlocked gates not unreasonable interference); *Falco v. Minzner,* 28 Misc.2d 300, 213 N.Y.S.2d 625 (N.Y.Sup.Ct.1961) (same); *Rupert v. Gunter, supra* note 4, 31 Wash. App. at 27, 640 P.2d at 36 (same); *cf. Missionary Soc'y of Salesian Congregation v. Evrotas,* 229 A.D. 392, 242 N.Y.S. 122 (1930), *modified on other grounds,* 256 N.Y. 86, 175 N.E. 523 (1931) (locked gate unreasonable); 28 C.J.S. *Easements, supra* note 4, § 98, at 781 ("[o]rdinarily locked

gates across a way constitute an unreasonable burden which will not be permitted").

Appellants have offered appellees the twin choices of an electronically controlled gate or an unlocked gate; there may be variations yet to be considered. Accordingly, as neither *Fields* nor *Preston* binds the trial judge to a particular result, we remand the case to the trial judge to determine anew, under the balancing standard described above, whether appellants' proposal unreasonably interferes with appellees' use of the right of way.

*Judgment reversed and case remanded.*

---

**10.** Moreover, the holding in *Preston* must be read in light of the facts before the court. *Preston* involved two gates already in existence, one of which the property owner conceded was kept "entirely closed all the time, day and night," *id.* at 415, and the other of which had been kept closed at least at night prior to the litigation, casting doubt on the owner's suggestion that the gates need not be bolted in the future. These circumstances, in light of the language of the deed ("'free and uninterrupted right of way forever' for the purpose of ingress, egress, and regress"), *id.* at 408, were the basis for the court's upholding the injunction, and not, as appellees' suggest, because the court concluded that the unlocked gate was an unreasonable interference.

APPENDIX

S Street

Lot 50
Appellants
Servient Estate

Alley to S Street

..Easement

Key

| | | | | Servient estate

. . . . . Easement

//// Dominant estate

Garage

Proposed gate

- - - Proposed fence & gates

↑
N
←W E→
S
↓

Lot 804
Appellees
Dominant Estate

R Street