**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 25, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JACK P. KATZ and INFINITY
CLARK STREET OPERATING, on
behalf of themselves and all others
similarly situated,

        Plaintiffs-Appellants,

    v.

ERNEST A. GERARDI, JR.; RUTH
ANN M. GILLIS; NED S. HOLMES;
ROBERT P. KOGOD; JAMES H.
POLK III; JOHN C. SCHWEITZER;
R. SCOT SELLERS; ROBERT H.
SMITH; STEPHEN R. DEMERITT;
CHARLES MUELLER, JR.;
CAROLINE BROWER; MARK
SCHUMACHER; ALFRED G.
NEELY; ARCHSTONE-SMITH
OPERATING TRUST; ARCHSTONE-
SMITH TRUST; and TISHMAN
SPEYER DEVELOPMENT
CORPORATION,

        Defendants-Appellees.

No. 10-1407

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:09-CV-01340-WYD-CBS)**

---

Kenneth A. Wexler, Wexler Wallace LLP, Chicago, Illinois (Olimpio Lee
Squitieri, Squitieri & Fearon LLP, New York, New York, with him on the briefs),
for Appellants.

Jonathan D. Polkes, Weil Gotshal & Manges LLP, New York, New York (Ashish D. Gandhi, Weil, Gotshal & Manges LLP, New York, New York, and Frederick J. Bauman and Alex C. Myers, Rothgerber Johnson & Lyons LLP, Denver, Colorado, with him on the brief), for Appellees.

Before **TYMKOVICH**, **BRORBY**, and **MATHESON**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

This case requires us to consider whether a plaintiff can split potential legal claims against a defendant by bringing them in two different lawsuits. We conclude that related claims must be brought in a single cause of action, and the district court properly dismissed the claim-splitting plaintiffs here. We also consider whether an investor who was forced to sell his shares as the result of a merger has standing to sue as a purchaser of securities under the 1933 Act. We find the Act applies only to purchasers of securities and not to forced sales resulting from a merger.

Jack P. Katz and Infinity Clark Street Operating were minority shareholders in a real estate investment trust owned by Archstone Smith Trust, a public company. Archstone entered into a merger agreement in which two investors acquired all of Archstone's outstanding public shares. As part of the merger, Katz and Infinity were squeezed out of the REIT and had the option of receiving either cash or stock in the newly formed entity in exchange for their shares. Katz opted for cash; Infinity chose stock. Claiming the offering documents associated with

the merger contained false and misleading statements or omissions, Katz and Infinity separately sued.

In Colorado, Infinity filed a federal class action lawsuit alleging breaches of contract and fiduciary duty relating to the merger. The district court dismissed the complaint with prejudice except as to one claim, and the case was stayed pending arbitration of the surviving claim.

Meanwhile, Katz filed a class action lawsuit in Illinois state court asserting securities law claims arising from the merger. The case was removed to federal court and eventually transferred to Colorado. Katz then filed an amended complaint joining Infinity as a party plaintiff, even though Infinity's case was still waiting the outcome of arbitration. The district court dismissed Katz's complaint, ruling that by joining the case, Infinity was improperly splitting claims that should have been alleged in its earlier action. The court also found Katz lacked standing to bring his securities law claims since he was not a purchaser when he opted to sell his shares. Katz and Infinity challenge the district court's decision on appeal.

We find the district court did not err, and we therefore AFFIRM the district court's judgment.

## I. Background

A. <u>The Merger</u>

Katz and Infinity, with others, owned 11% of the Class A Common Units of a real estate investment trust (REIT), the Archstone Smith Operating Trust

(Archstone REIT). Archstone Smith Trust (Archstone), a publicly traded corporation, owned the remaining 89% of the Archstone REIT. Archstone was the Archstone REIT's sole trustee, controlling the management and administration of its properties.

Infinity and Katz had previously contributed properties to a different REIT—later acquired by Archstone—so as to gain certain tax and financial benefits. Katz and Infinity held their interest in the Archstone REIT in the form of "A-1 Units." The A-1 Units had special advantages—liquidity rights, dividend rights, and tax indemnification—that made them particularly valuable to Katz and Infinity. Archstone agreed not to sell, exchange, or dispose of any properties in the Archstone REIT before 2022 that would cause any tax liability for the A-1 Unitholders. If Archstone did dispose of properties that created a tax liability, it was required to indemnify the unitholders in the amount of the liability. Also, the unitholders had a liquidity option through which they could redeem their A-1 Units for the market price of Archstone's common shares. Archstone could provide either shares, or their cash equivalent, when an A-1 Unitholder elected to redeem their units. Finally, the unitholders were entitled by law to receive dividends of any profits from the Archstone REIT's operations.

In May 2007, Archstone announced a merger agreement in which Lehman Brothers and Tishman Speyer would acquire Archstone for approximately $22.2 billion. Lehman and Tishman would take Archstone private by acquiring all of its

outstanding common stock for $60.75 per share, which represented a 22% premium over the common stock's pre-announcement price. There were several steps to the merger, but as it relates to the Archstone REIT, only Archstone's approval was needed for the merger because it owned a majority of the A-1 Units. The minority A-1 Unitholders (i.e., Katz and Infinity) had no voting rights and were not entitled to vote on the merger. The merger was approved and closed in October 2007.

In the merger, the minority A-1 Unitholders had the right to elect the form of consideration they would receive in exchange for their A-1 Units. They could receive either: (1) $60.75 per unit, as paid to Archstone's public shareholders, (2) new units in the private entity with the stated value of $60.75 per unit, or (3) a combination of cash and new units. In the Prospectus and Registration Statement for the merger, Archstone explained that the new units would be materially different, and possibly less favorable, than the now superceded A-1 Units.

Katz and Infinity found the options unappealing because they contend the cash-out price did not reflect the tax indemnification and liquidity benefits of the A-1 Units, and the new units had none of these features. Nonetheless, Katz elected to receive the $60.75 cash offer, and Infinity elected to receive the new units in the post-merger entity.

B.      The Infinity and Katz Class Actions

Katz and Infinity filed separate class actions alleging the Prospectus, Registration Statement, and other offering documents associated with the merger contained false and misleading statements and omissions.  They claimed various aspects of the merger, including an analysis of its risks, were not disclosed.  Katz represented the cash-out subclass of A-1 Unitholders who sold their A-1 Units for cash.  Infinity represented the class of investors who exchanged their A-1 Units for new units.

Because it bears on our analysis below, a review of the procedural history of the two class actions is necessary to understand the reasons for the district court's dismissal of Infinity from this case.

1.      *Infinity Class Action*

In November 2007, Infinity and an individual investor, Steven A. Stender,[1] filed a class action in Colorado, naming the appellees here.  They asserted various breach of contract and fiduciary duty claims arising out of the merger.  The district court eventually dismissed the complaint with prejudice except for one breach of contract claim.  The case was stayed pending arbitration of the contract claim and administratively closed.

---

[1]  Stender, like Infinity and Katz, was a Class A-1 Unitholder of the Archstone REIT.  Stender was a plaintiff in the district court but does not appeal the district court's dismissal as it relates to him.  *See* Aplt. Br. at 1 n.2.

With the case still closed, Infinity sought leave to amend the complaint with additional claims of breach of contract and fiduciary duty, nearly identical to the previously dismissed claims. While Infinity had earlier informed the court it intended to add securities claims, it did not do so.

After this filing, the district court reopened the case. It modified its previous order, dismissing some of the breach of contract and fiduciary duty claims *without* prejudice, but affirming the dismissal with prejudice of the other claims. The court granted the motion to amend the complaint. It then stayed the case pending the completion of arbitration, at which point plaintiffs could file an amended complaint in compliance with the court's order. The court again administratively closed the case.

After these events, Infinity filed several additional motions asking the court to revisit its rulings. These were all denied and in May 2010, the court again administratively closed the case pending completion of arbitration.

2.    *Katz Class Action*

In May 2008, Katz filed a class action in Cook County, Illinois state court asserting securities fraud claims in connection with the merger. That case was removed to federal court, where the defendants requested it be transferred to the District of Colorado. Katz opposed removal and the transfer. The district court remanded the case to state court, which defendants challenged.

On appeal, the Seventh Circuit vacated the district court's decision and remanded for a hearing on issues regarding removal. *See Katz v. Gerardi*, 552 F.3d 558 (7th Cir. 2009). On remand to the district court, both parties sought to transfer the case to Colorado. The case was transferred in June 2009.

In August 2009, while Infinity's federal case was administratively closed, Katz filed an amended complaint which joined Infinity and Stender in his case as plaintiffs and asserted claims under the Securities Act of 1933 (1933 Act) (§§ 11, 12(a)(2) & 15), and the Securities Exchange Act of 1934 (1934 Act) (§§ 10(b), 20(a); Rule 10b-5).

In August 2010, the district court dismissed the amended complaint. It dismissed Infinity from the case because it asserted claims that could have been brought in its other, previously filed Colorado lawsuit. The court dismissed Katz's 1933 Act claims because he was not a purchaser of securities and therefore lacked standing under the statute.[2] Katz and Infinity appeal this decision.

3.     *Developments After the Dismissal of the Complaint*

After the district court's dismissal in this case, two additional developments occurred that bear on this appeal. In September 2010, Infinity moved to amend the complaint in its other lawsuit to include the same securities law claims asserted in this

---

[2] The district court also dismissed Katz's claims under the 1934 Act for failure to adequately plead loss causation. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345–46 (2005). Katz does not challenge that decision on appeal, and we do not address it.

case. In April 2011, after briefing was submitted in this appeal, the district court granted Infinity's request to file an amended complaint including these claims.

## II. Discussion

Katz and Infinity argue the district court erred in dismissing the complaint. Infinity argues it did not improperly bring claims that could have been asserted in its other case. Katz contends the district court erred in finding he was not a purchaser of securities under the 1933 Act. Each of these theories are analytically distinct so we address them in order.

### A.     Infinity

The district court dismissed Infinity from this case because the court concluded Infinity had improperly split its claims between this case and its action already pending in the District of Colorado.

The rule against claim-splitting requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit. By spreading claims around in multiple lawsuits in other courts or before other judges, parties waste "scarce judicial resources" and undermine "the efficient and comprehensive disposition of cases." *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp*. 296 F.3d 982, 985 (10th Cir. 2002). We review for abuse of discretion when a district court's "dismissal for claim-splitting was premised in significant measure on the ability of the district court to manage its own docket," *id.*, and will reverse the district court only if we find its judgment "exceeded the bounds of the

rationally available choices given the facts and the applicable law in the case at hand." *Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir. 2008).

Infinity argues the district court erred because no final judgment was entered in the other case. Without a final judgment, Infinity contends the prohibition against claim splitting does not apply.[3] And even if the court did not err in the dismissals, Infinity argues the court should allow it to substitute a different plaintiff to pursue claims on behalf of the investors who elected to receive new units in the merger. We reject each of these arguments.

1. *Claim-Splitting*

District courts have discretion to control their dockets by dismissing duplicative cases. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("As between federal district courts . . . though no precise rule has evolved, the general principle is to avoid duplicative litigation."). Long ago, the Supreme Court captured the general principle regarding claim-splitting:

> When the pendency of a [previously filed] suit is set up to defeat another, the case must be the same. There must be the same parties, or, at least, such as represent the same interests; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts, and the title, or essential basis, of the relief sought must be the same.

---

[3] Infinity also contends the claims for relief in the two suits were not identical. Because Infinity raises this argument for the first time on appeal, we do not consider it. *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993).

*The Haytian Republic*, 154 U.S. 118, 124 (1894) (quotation omitted); *see also*

*Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000) ("[P]laintiffs have no

right to maintain two actions on the same subject in the same court, against the

same defendant at the same time.").  We have noted that "more recent cases

analyze claim-splitting as an aspect of res judicata." *Hartsel*, 296 F.3d at 986

(collecting cases); *see also Stone v. Dep't of Aviation*, 453 F.3d 1271, 1278 (10th

Cir. 2006) ("A plaintiff's obligation to bring all related claims together in the

same action arises under the common law rule of claim preclusion prohibiting the

splitting of actions.").

Infinity claims that there can be no claim splitting as long as there is no

final judgment in the other case.  We disagree.  While it is correct that a final

judgment is necessary for traditional claim preclusion analysis, it is not required

for the purposes of claim splitting.

The doctrine of claim preclusion, or res judicata, requires as one element a

valid, final judgment on the merits.  *See Pelt v. Utah*, 539 F.3d 1271, 1281 (10th

Cir. 2008); Wright & Miller, 18A FEDERAL PRACTICE & PROCEDURE JURISDICTION

§ 4432 (2d ed. 2011).[4]  While we analyze claim splitting as an aspect of res

judicata, the claim-splitting doctrine does not fall within a conventional res

---

[4]  In Colorado, claim preclusion requires "the presence of four elements:  1)
finality of the first judgment; 2) identity of subject matter; 3) identity of claims
for relief; and 4) identity or privity between parties to the actions."  296 F.3d at
986–87 (quoting *Cruz v. Benine*, 984 P.2d 1173, 1176 (Colo. 1999)).

judicata analysis. *See Curtis*, 226 F.3d at 138 ("The rule against duplicative litigation is distinct from but related to the doctrine of claim preclusion or *res judicata*.").

To be sure, claim splitting and res judicata both serve the same interests of promoting judicial economy and shielding parties from vexatious concurrent or duplicative litigation. But claim splitting is more concerned with the district court's comprehensive management of its docket, whereas res judicata focuses on protecting the finality of judgments. *See* Wright & Miller, *supra* § 4406 (considering it an "exaggeration" to describe claim splitting as an aspect of res judicata). The difference also appears in our standards of review for claim splitting (abuse of discretion) and res judicata (de novo). *Compare Hartsel*, 296 F.3d at 985 (reviewing dismissal for claim splitting for abuse of discretion) *with Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards*, 314 F.3d 501, 503 (10th Cir. 2002) (reviewing whether the doctrine of res judicata applies de novo).

With these different interests in mind, we have held that a final judgment is not a necessary component of the claim-splitting analysis:

> It is clear that a motion to dismiss based on improper claim-splitting need not—indeed, often cannot—wait until the first suit reaches final judgment. . . . Thus, in the claim-splitting context, the appropriate inquiry is whether, *assuming that the first suit were already final*, the second suit could be precluded pursuant to claim preclusion.

*Hartsel*, 296 F.3d at 987 n.1 (emphasis added). Otherwise, a defendant could "lie in wait silently until one of the two actions is brought to judgment to ambush the

-12-

plaintiff and defeat the other action." *Id.*; *see also Brady v. UBS Fin. Svc., Inc.*, 538 F.3d 1319, 1327 n.10 (10th Cir. 2008) ("The first suit need not reach final judgment before a motion to dismiss based on improper claim-splitting can be granted."); Wright & Miller, *supra* § 4406 ("In dealing with simultaneous actions on related theories, courts at times express principles of 'claim splitting' that are similar to claim preclusion, but that do not require a prior judgment.").

Our precedent cannot be clearer: the test for claim splitting is not whether there is finality of judgment, but whether the first suit, assuming it were final, would preclude the second suit. This makes sense, given that the claim-splitting rule exists to allow district courts to manage their docket and dispense with duplicative litigation. If the party challenging a second suit on the basis of claim splitting had to wait until the first suit was final, the rule would be meaningless. The second, duplicative suit would forge ahead until the first suit became final, all the while wasting judicial resources.

Also, different treatment is warranted because of the different results created by a dismissal under res judicata and claim splitting. A dismissal on res judicata grounds can stop a case in its tracks; a plaintiff is precluded from asserting a claim. In such a case, we leave a party without recourse for its claims, and thus we want to be sure such a decision stems from a previous valid, final judgment on the merits. But with a dismissal on claim-splitting grounds, by its nature, the dismissed party is involved in another pending suit regarding the same

subject matter against the same defendants. Given the toll on a court's docket, the rule does not impose the more stringent requirement of a final judgment.

As a fallback argument in light of *Hartsel*, Infinity also contends the other lawsuit is still in the pleading stages, with very little being determined, and has been administratively closed. It argues in those circumstances nothing is to be gained by preventing it from bringing new claims in this lawsuit.

Infinity's argument is unpersuasive and misunderstands the prohibition against claim splitting. When we assess whether duplicative claims have been asserted, we *assume* the finality of the first suit for the purposes of the analysis. Infinity argues as if we engage in a conventional res judicata analysis that requires a valid, final judgment. We do not. The proper question is whether, assuming the first suit was already final, the second suit would be precluded under res judicata analysis. *See Hartsel*, 296 F.3d at 987 n.1. Once we assume finality here, all of the requirements of claim preclusion are met.

An additional reason supports this outcome. The district court in the other action has allowed Infinity to amend its complaint and file additional claims. *See Stender v. Cardwell*, No. 07-cv-2503, Doc. 150, at 8 (D. Colo. Apr. 1, 2011). In its amended complaint, Infinity asserts the same securities law claims under the 1933 and 1934 Acts that it asserts here. In fact, Infinity essentially admits to claim splitting with this case. Infinity states it brings the securities law claims "to preserve the claims of the [investors in the new units] in the event that the relief

sought from the Tenth Circuit . . . is not granted." *Id.*, Doc. 151, at 79 (§ 11

claim); *see also id.* at 83 (same) (§ 12(a)(2) claim); *id.* at 86 (same) (§ 15 claim).

And at oral argument in this case Infinity even conceded the securities law claims

can be litigated in its other lawsuit.[5]

Infinity has filed two cases in the same district court, involving the same

subject matter, seeking the same claims for relief against the same defendants.

The district court did not abuse its discretion by dismissing Infinity from this case

for claim splitting.

2.      *Substitute Plaintiff*

Infinity also requests that, if we affirm the dismissal, we remand the case

and permit it to substitute a plaintiff who could represent the interests of those

shareholders who opted to receive the new units.  Infinity argues it could not have

foreseen any claim-splitting problems when it joined this suit and the class of

investors in the new units should not be prejudiced by its actions.  But Infinity's

amended complaint—with the same securities law claims—has now been accepted

---

[5]  We see no reasonable basis that Infinity's claim-splitting argument can survive
now that its motion to amend in the other lawsuit was granted.  Infinity may argue
it cannot pursue its amended complaint in the other case because it is
administratively closed until arbitration is completed.  But that is not a valid
reason to ignore its claim splitting.  *See Hartsel*, 296 F.3d at 990 ("It is well-
settled that a plaintiff may not use the tactic of filing two substantially identical
complaints to expand the procedural rights he would have otherwise enjoyed.")
(quotation omitted).

in the other lawsuit. Any concern that the new unitholders would not be represented is unfounded.

In sum, we affirm the district court's decision to dismiss Infinity from this case for improper claim splitting.

B.    <u>Katz</u>

The district court dismissed Katz's 1933 Act claims because it concluded he was not a purchaser of securities and therefore lacked standing to bring those claims. Katz contests this conclusion, arguing he, in fact, was a purchaser under the securities laws for a single reason: the merger caused a fundamental change of his A-1 units that so altered the nature of his investment as to transform them into "new" A-1 Units. In his view, the A-1 Units lost their valuable liquidity, dividend, and tax indemnification features upon the announcement of the merger. The merger effectively forced him to purchase the "new" A-1 Units, which lacked the advantageous characteristics of the "old" units, for purposes of the 1933 Act.

We reject this argument. The merger did not force him to purchase new securities, but only to sell his A-1 Units for cash or new units. Since Katz's 1933 Act claims only give standing to purchasers of securities, which Katz is not, his claims were properly dismissed.

1.    *1933 Act Claims*

Katz brought two substantive claims under §§ 11 and 12(a)(2)[6] of the 1933 Act related to the merger.  But both sections provide relief *only* for purchasers—*not* sellers—of securities.  *See* 15 U.S.C. § 77k(a) [§ 11] ("any person *acquiring* such security . . . may . . . sue") (emphasis added); § 77l(a) [§ 12(a)(2)] ("Any person who . . . offers or sells a security . . shall be liable . . . to the person *purchasing* such security.") (emphasis added); *see also Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000) ("[W]e conclude that an aftermarket purchaser has standing to pursue a claim under section 11."); Thomas L. Hazen, 1 LAW OF SECURITIES REGULATION § 1.2 (6th ed.) ("The scope of the Securities Act of 1933 is limited . . . its investor-protection reach extends only to purchasers (and not sellers) of securities.").  It is clear only purchasers of securities may assert claims under §§ 11 and 12(a)(2) of the 1933 Act.  If Katz cannot demonstrate that he was a purchaser of  securities, he lacks standing to bring his claims under the 1933 Act.[7]

---

[6]  Katz also brought a third claim under § 15 of the 1933 Act, which imposes control person liability for violations of §§ 11 and 12(a)(2).  *See* 15 U.S.C. § 77o.

[7]  The 1933 Act contrasts with the more familiar anti-fraud provision of the 1934 Act—§ 10(b) and Rule 10b-5—that prohibits manipulative or deceptive devices "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

In the merger, Katz elected to receive $60.75 in exchange for each of his A-1 Units. That is, he *sold* each A-1 Unit for $60.75. From a plain view of the transaction, Katz was a seller, not a purchaser. Undeterred, Katz contends that, in fact, he was a purchaser and has standing. He argues that under the so-called fundamental change doctrine, the merger's effect on his A-1 Units caused him to acquire "new" A-1 Units, making him a purchaser and giving him standing to sue under the 1933 Act.

2.      *Fundamental Change Doctrine*

To evade the problem that Katz did not purchase securities in the merger, he asks us to apply the fundamental change doctrine. The fundamental change doctrine—also known as the forced seller doctrine—has been applied in securities fraud cases when "the shareholder is faced with the choice of either holding stock in a nonexistent corporation or exchanging his shares for value as is the case in liquidations and certain types of mergers." *Anderson v. Dixon*, No. 95-4119, 1996 WL 276183, at *2 (10th Cir. May 24, 1996) (quotation omitted); *see also* Hazen, *supra* § 12.7[3][A] (6th ed.) ("When a shareholder is frozen out of a corporation or otherwise put in the position of a 'forced seller,' Rule 10b-5 standing ordinarily will exist even though there was no voluntary investment decision.").

The doctrine enables a shareholder, whose investment has been fundamentally changed, to meet the causation and reliance requirements of the securities laws even though the shareholder has not made an actual purchase or

-18-

sale of securities. *See* Loss & Seligman, SECURITIES REGULATION 3740 (3d ed. 2004) ("The forced seller doctrine has been expanded to a variety of transactions . . . where a defendant's fraud results in a fundamental change in the nature of the plaintiff's investment without the plaintiff's consent."). Several circuits have adopted the doctrine,[8] though others have questioned its continuing validity.[9] We have previously declined to adopt the doctrine, *Anderson*, 1996 WL 276183, at *2, but Katz requests we do so now and apply it here.

As we noted, Katz argues a fundamental change occurred "the minute the Archstone board accepted the Merger, creating *de facto* new A-1 units" that lacked the advantageous liquidity, dividend, and tax characteristics of the original A-1 units. Aplt. Br. at 35. He contends his only choice was to either accept the new units, which lacked the same benefits of the A-1 units, or cash out his interest without the tax indemnification the A-1 Units had provided. Katz claims that the "choice," either way, was "irrelevant" because the unitholders were forced to accept inferior new units or cash-out without tax indemnification. Aplt. Br. at 35.

---

[8] *See Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1498–99 (9th Cir. 1995); *Bold v. Simpson*, 802 F.2d 324, 320–21 (8th Cir. 1986)*; Rathborne v. Rathborne*, 683 F.2d 914, 921 (5th Cir. 1982); *see also Badger v. S. Farm Bureau Life Ins. Co.*, 2008 WL 1884887, at *10 (M.D. Fla. Apr. 25, 2008) (noting the Fifth Circuit's forced seller doctrine is binding precedent in the Eleventh Circuit).

[9] *See Isquith by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 535–36 (7th Cir. 1998) (describing the "esoteric and dubious judge-made doctrine, called the 'fundamental change' doctrine" and admitting "very much doubt that the doctrine retains any validity in any class of case, even in squeeze-out cases").

We have previously declined to adopt the fundamental change doctrine and we decline to do so again here for several reasons. First, the doctrine only applies to claims under the 1934 Act, where Katz's claims here arise under the 1933 Act. Second, even assuming the doctrine did apply to Katz's 1933 Act claims, the doctrine does not make him a "purchaser" of securities.

3.     *Fundamental Change/1933 Act Claims*

The fundamental change doctrine does not apply to Katz's 1933 Act claims because the doctrine is limited to claims under the 1934 Act. Katz argues the doctrine should apply equally to claims under both Acts. He cites two cases from other circuits that he claims applied the fundamental change doctrine to 1933 Act claims: *7547 Corporation v. Parker & Parsley Development Partners*, 38 F.3d 211 (5th Cir. 1994), and *In re Union Exploration Partners Securities Litigation*, No. 90-3125, 1992 WL 203812 (C.D. Cal. June 18, 1992). But each is distinguishable.

In *7547 Corporation*, the Fifth Circuit confined its application of the forced seller doctrine to its analysis of whether plaintiffs had standing to assert claims under § 10(b) and Rule 10b-5 of the 1934 Act. 38 F.3d at 226–29. Notably, the court also considered plaintiff's standing under §§ 11 and 12(a)(2) of the 1933 Act—the same sections Katz asserts here—and made *no* mention of the forced seller doctrine. *Id.* at 222–25. The case does not support Katz's argument. Actually, it undermines his position because the court applied the forced seller

doctrine *only* to the 1934 Act claims, even though 1933 Act claims were also at issue in the case.

In *Union Exploration Partners*, the court cited the forced seller doctrine and concluded plaintiffs could bring their claims under § 10(b). 1992 WL 203812, at *3. It also applied the forced seller doctrine to plaintiff's § 12(a)(2) claims, finding the plaintiffs had satisfied § 12(a)(2)'s causation requirement. *Id.* at *5. The court's focus was on whether plaintiffs had demonstrated a causal connection between the fraud and the purchase of securities. Because the argument about causation was "essentially the same" one asserted in connection with the § 10(b) claims, the court decided to apply the forced seller doctrine to the § 12(a)(2) claims as well. *Id.*

Even though the court applied the forced seller doctrine to claims under the 1933 Act, the case does not help Katz. The court's reasoning was solely focused on the causation requirement of § 12(a)(2), not the purchaser requirement at issue here. Because the causation argument was similar to the causation argument for § 10(b), the court applied the doctrine. There is no such similarity here. Section 12(a)(2)'s strict purchaser requirement has no analogue in the broad provisions of § 10(b) and Rule 10b-5.

Reviewing these two cases with a critical eye reveals they do not support Katz's argument that the fundamental change doctrine should apply to claims under the 1933 Act. We have also located no other cases that apply the doctrine to

the 1933 Act. From our review of the case law, courts only apply the fundamental change doctrine in relation to the 1934 Act's anti-fraud provisions (i.e. § 10(b) and Rule 10b-5) and we see no reason to disturb this interpretation.

Katz argues as if the 1933 and 1934 Acts are the same, such that an application of the doctrine to the 1933 Act would not be a significant extension. But this argument ignores the fundamental differences between the 1933 and 1934 Acts. Restricting the doctrine to the 1934 Act comports with § 10(b)'s expansive anti-fraud provision, covering fraud "in connection with the purchase or sale" of a security. 15 U.S.C. § 78j(b). By contrast, the narrow provisions of §§ 11 and 12(a)(2) of the 1933 Act only apply to an individual "purchasing" or "acquiring" a security. *See id.* §§ 77k(a), 77l(a). This narrower focus weighs heavily against extending the fundamental change doctrine to the 1933 Act.

Ultimately, Katz is simply trying to repackage claims under the 1933 Act that he brought below under the 1934 Act. But the district court dismissed these claims because Katz failed to adequately plead loss causation. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345–46 (2005) (holding securities fraud plaintiffs must plead and prove loss causation as an element of claims under § 10(b) and Rule 10b-5). Katz does not appeal the dismissal of his 1934 Act claims and cannot resurrect them through a citation to the fundamental change doctrine. In sum, even if we adopted the fundamental change doctrine, it would not apply to Katz's claims under the 1933 Act.

4.      *Fundamental Change/Failure to Acquire or Purchaser*

Further, even if we adopted the fundamental change doctrine and applied it to Katz's 1933 Act claims, it is still no help.  In a forced sale, he is still a *seller*, not a purchaser.  To find that Katz has standing, we would still have to assume he purchased the "new" A-1 Units, which he never did.  In fact, Katz owned the same A-1 Units both before and after the merger was announced.  Nothing can convert the sale of his A-1 units for cash into a purchase of shares he never acquired.

Finally, it is worth noting the Seventh Circuit considered these same arguments during the appeal regarding removal to federal court.  *Katz v. Gerardi*, 552 F.3d 558 (7th Cir. 2009).   Like us, the court found the claim unpersuasive:

> Katz depicts himself as a buyer by characterizing the supposed failure to honor the terms of the A-1 Units as if he had sold those securities and "bought" what Katz calls "new A-1 Units," which he then sold for cash.  (A "purchase" of "new A-1 Units" would have been involuntary, but an involuntary purchase is still a purchase.)
>
> What Katz calls the "fundamental change doctrine" that turns a sale into a purchase is word play designed to overcome the actual text of the securities laws, and this circuit follows the statutes rather than trying to evade them with legal fictions.  Katz sold his units for cash; he did not buy any new security.  The "new A-1 Units" are figments of a lawyer's imagination.  Using legally fictitious (and factually nonexistent) "new A-1 Units" to nullify a legislative decision that only buyers have rights under the 1933 Act would be wholly unjustified.

*Id.* at 560 (citations omitted).  This assessment of Katz's argument captures its flaws and lack of merit.  To say the merger made Katz a purchaser of "new" A-1 Units is verbal alchemy unsupported by the text of the 1933 Act or the case law.

The district court properly dismissed Katz's 1933 Act claims for lack of standing.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.