**CARROLLSBURG, A Condominium Unit Owners Association, et al., Appellants,**

v.

**Eric ANDERSON, et al., Appellees.**

**No. 00–CV–173.**

District of Columbia Court of Appeals.

Argued Jan. 2, 2001.

Decided Feb. 14, 2002.

---

56 ■ ■

Andrew Terrell, with whom Julianne E. Dymowski, Washington, was on the brief, for appellants.

Benny L. Kass, with whom Derick P. Berlage was on the brief, Washington, for appellees.

Before STEADMAN, SCHWELB, and REID, Associate Judges.

REID, Associate Judge.

In *Taylor v. Eureka Inv. Corp.*, 482 A.2d 354 (D.C.1984), we held that the owners of town house units in Carrollsburg Square, in the Southwest section of the District of Columbia ("Carrollsburg Square owners" or "appellees"), who maintained that they had a right to park without charge in an underground garage in the nearby Carrollsburg high-rise apartment building condominium ("Carrollsburg Condominium") due to a parking easement, "were entitled to judgment as a matter of law." We stated that "[t]he covenant clearly does not suggest that the [grantors] granted the parking easement in consideration for a monthly fee," *id.* at 358, but that on the contrary, "the owners granted the parking rights ... in exchange for the zoning exception." *Id.* Accordingly, "[t]he subsequent owners of the servient estate cannot now claim a right to additional compensation." *Id.* at 359.

Some fifteen years after our decision in *Taylor, supra,* a new dispute arose when the Carrollsburg Condominium Unit Owners Association (the "Carrollsburg Condominium Association" or "appellants") sought to impose a maintenance fee on the Carrollsburg Square owners for the upkeep of the underground parking garage in the Carrollsburg Condominium. The dispute intensified when the Carrollsburg Condominium Association relocated access to the underground parking from the interior lobbies and elevators of the Carrollsburg Condominium to exterior ramps.

In response to the actions of the Carrollsburg Condominium Association, the Carrollsburg Square owners filed suit challenging the parking maintenance fee and the relocation of the easement. Appellants and appellees lodged motions for partial summary judgment on specified counts of the complaint. As indicated in the Factual Summary section of this opinion, the trial court ultimately disposed of all counts of appellees' complaint, as well as appellants' counterclaim. In part, the court ordered: (1) "that a permanent injunction be entered whereby [appellants] will provide parking as stated in the [accessory parking c]ovenant free of any and all charges whatsoever, whether they be designated for use or for maintenance, repair, or any other named reason"; and (2) "that [appellants] permit [appellees] ... use of the lobbies and elevators to access the underground garage as established by custom...."

The Carrollsburg Condominium Association appealed. Because we detect no error, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

The record on appeal shows that in April 1999, appellants notified appellees that they were each required to pay $20 per month, retroactive to January 1, 1999, or a total of $80 payable by April 12, 1999, for the "maintenance, repair and replacement expenses associated with the parking spaces" in the Carrollsburg Condominium. When appellees refused to pay the maintenance fee, they were denied access to their underground parking spaces through the lobby and elevators of the Carrollsburg Condominium. Instead, they had to access their parking spaces from the outside through parking or automobile ramps. In reaction to the denial of access through the lobby and elevators, the Carrollsburg Square owners filed a verified complaint containing six counts against the Carrollsburg Condominium Association, its Board of Directors, and members of the Board in their individual and official capacities (collectively "the Carrollsburg Condominium Association" or "appellants").[1] The Carrollsburg Condominium Association filed a counterclaim seeking a declaratory judgment that the Carrollsburg Square owners were required "to contribute to the costs of operating, maintaining, repairing and replacing the underground garage...."

The parties filed cross partial motions for summary judgment[2] which essentially raised the same issues. By order docketed on December 10, 1999, the trial court denied the Carrollsburg Condominium Association's motion for partial summary judgment as to the breach of covenant count on *res judicata* grounds because it could have "raise[d] the issue of [parking] maintenance [fees] by counterclaim at any time during the *Taylor* litigation," or made appropriate post-judgment motions. Having determined that *Taylor, supra,* recognized the existence of an express easement located in the lobbies and elevators of the Carrollsburg Condominium, the trial court granted summary judgment on that count on behalf of the Carrollsburg Square owners, and dismissed their prescriptive easement count as moot. Moreover, since the Carrollsburg Condominium Association "is a privately owned condominium, not a public accommodation ....," the trial court dismissed the ADA count of the complaint. It also dismissed the DCHRA count, in part because the Carrollsburg Square owners never sought reasonable accommodations.[3] Finally, the trial court ordered that:

> a permanent injunction be entered whereby [the Carrollsburg Condominium Association] will provide parking as stated in the 1964 Covenant and [the trial court's 1985 order]. This parking privilege is to be provided free of any and all charges whatsoever, whether

1. Count I requested injunctive relief to gain access to the parking spaces through the lobby and elevators of the Carrollsburg high-rise apartment building. A related Count II alleged breach of the January 27, 1964 parking covenant that was the subject of *Taylor, supra.* Count III specified that the Carrollsburg town house owners possessed a prescriptive easement with respect to access through the lobby and elevators. Counts IV and V alleged violations of the Americans With Disabilities Act ("the ADA") and the District of Columbia Human Rights Act ("the DCHRA"), respectively, and Count VI sought an order holding the Carrollsburg Association in civil contempt

for violation of the trial court's order of April 16, 1985.

2. The Carrollsburg Condominium Association demanded summary judgment regarding an alleged express or prescriptive easement; and both the ADA and the DCHRA claim. The Carrollsburg Square owners sought summary judgment with respect to the breach of covenant (express easement) claim and their prescriptive easement count.

3. Neither the ADA nor the DCHRA claim is at issue in this appeal.

they be designated for use or maintenance, repair, or any other named reason; [and that:]

[the Carrollsburg Condominium Association] permit [the Carrollsburg Square owners], their successors, invitees, and guests, use of the lobbies and elevators to access the underground garage as established by custom; which use constitutes "legal access" and "legal ingress and egress", and provide such keys and unobstructed access as [is] enjoyed by other [Carrollsburg] residents, without charges of any kind . . . .

The Carrollsburg Condominium Association's motion for reconsideration was denied, mainly for the reasons stated in the trial court's December 10th order. In addition, with respect to the trial judge's application of the *res judicata* doctrine, the court pointed out that the issue was raised in appellees' answer to the appellant's counterclaim, and that, at any rate, "a trial court may enter summary judgment *sua sponte* to prevent unnecessary trials."

## ANALYSIS

The Carrollsburg Condominium Association raises three arguments on appeal. First, they contend that the trial court erred in determining that the 1964 Accessory Parking Covenant addresses "maintenance, repair and replacement costs associated with the parking spaces/garage . . . ." and upkeep. Because the issue is not addressed in the 1964 Covenant, they argue, "the common law duty placed on easement holders to contribute to the maintenance and repair of the easement area they use should control." Second, they contend that the trial court committed error by dismissing their "counterclaim *sua sponte* based on the theory of *res judicata.*" Third, they assert, in part, that there are "genuine issues of material facts as to whether the garage ramp provides [the Carrollsburg Square owners] with 'legal access' to the parking spaces." In response, the Carrollsburg Square owners maintain that: "The twenty dollar per month parking fee that the Carrollsburg Condominium Association sought to collect in 1999—whether disguised as a 'lobby access fee' or 'maintenance'—is plainly prohibited under the covenant and the prior judicial orders[,]" and consequently, is subject to "claim preclusion" because of *Taylor, supra.* Second, they argue that, as a matter of law, under the 1964 Accessory Parking Covenant, they are entitled to "the reasonable right of passage," that is, convenient and safe access to the garage through the lobby and elevators of the Carrollsburg Condominium, rather than by way of the allegedly unsafe automobile ramp.

■ "In reviewing a trial court order granting a summary judgment motion, we conduct an independent review of the record . . . ." *Tavakoli–Nouri v. Gunther,* 745 A.2d 939, 941 (D.C.2000) (citing *Sherman v. District of Columbia,* 653 A.2d 866, 869 (D.C.1995)). "Summary judgment is appropriate if, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citing Super. Ct. Civ. R. 56(c); *American Cont'l Ins. Co. v. Pooya,* 666 A.2d 1193, 1197 (D.C.1995)); *see also Lund v. Watergate Investors Ltd. P'ship,* 728 A.2d 77, 81 (D.C.1999). "Whether the trial court correctly applied *res judicata* principles to the facts of this case is a legal issue that we decide *de novo.*" *Shin v. Portals Confederation Corp.,* 728 A.2d 615, 618 (D.C.1999) (referencing *Osei–Kuffnor v. Argana,* 618 A.2d 712, 713 (D.C.1993)).

■ As we recognized in *Taylor, supra,* the District of Columbia and the Redevelopment Land Agency, and the Carrolls-

burg Square Corporation, "agree[d in the decade of the 1960s,] to provide legal access to and from [specified] accessory parking spaces in [the] underground garage...." Accessory Parking Covenant ("the Covenant"), at 4;[4] *see also Taylor, supra,* 482 A.2d at 355. In interpreting the Covenant, we said:

> The [C]ovenant specifically states that the owners granted the parking rights in the servient estate (now Carrollsburg) in exchange for the zoning exception which allowed them to develop the dominant estate (now Carrollsburg Square).

*Taylor, supra,* 482 A.2d at 358. We concluded that the Covenant discussed "compensation," and that the Carrollsburg Square owners "did pay for the parking spaces when they bought their units." *Id.* at 358. In addition, we declared that:

> The subsequent owners of the servient estate cannot now claim a right to additional compensation for a preexisting easement. To grant them the rental value of appellants' parking spaces would give them a windfall without any basis in the parking covenant.

*Id.* at 359. Consequently, we "h[e]ld that [the Carrollsburg Square owners], not [the Carrollsburg Condominium Association], were entitled to summary judgment." *Id.*

Applying our decision in *Taylor, supra,* to the case now before us, we see no material difference for *res judicata* purposes between "the monthly rental fee" for the underground parking spaces that was the subject of *Taylor* and "the monthly maintenance fee" for parking which the Carrollsburg Condominium Association im-

posed on the Carrollsburg Square owners. Like the monthly rental fee, the monthly maintenance fee may be characterized as "compensation" for a preexisting easement for which the Carrollsburg Condominium Association already had been paid.[5]

■ Since there is no material difference between the monthly fee for parking, which we considered in *Taylor, supra,* and the monthly maintenance fee imposed in this case, we next examine the question as to whether the trial court erred by applying *res judicata* principles *sua sponte.* In *Johnson v. Capital City Mortgage Corp.,* 723 A.2d 852 (D.C.1999), we reiterated the principle that: "Under the doctrine of *res judicata,* 'a final judgment on the merits ... precludes relitigation in a subsequent pr[o]ce[e]ding of all issues arising out of the same cause of action between the same parties or their privies, whether or not the issues were raised in the first proceeding.'" *Id.* at 856 (quoting *Carr v. Rose,* 701 A.2d 1065, 1070 (D.C.1997) (citations omitted)). We also emphasized that, "[s]uch a judgment ... 'estops not only as to every ground of recovery or defense actually presented in the action, but also as to every ground which might have been presented.'" *Id.* (quoting *Carr, supra,* 701 A.2d at 1070 (citing *Molovinsky v. Monterey Coop.,* 689 A.2d 531, 533 (D.C. 1997))).

■ Here, appellants' claim not only arises out of the same unambiguous 1964 Accessory Parking Covenant that was at issue in *Taylor, supra,* but also is based on the precise provision that was interpreted

---

4. For the full text of paragraph 4 of the Covenant, see note 6, *infra.*

5. To be sure, there may be a difference between a portion of a rental fee that constitutes in effect a temporal purchase price and the portion that constitutes the ongoing maintenance costs that every owner must incur. But for *res judicata* purposes, the overall question of every form of payment that might be owed by the Carrollsburg Square owners for their parking privilege was contained in the "factual nucleus" of the *Taylor* litigation. *See Watergate W. v. Barclays Bank, S.A.,* 759 A.2d 169, 178–80 (D.C.2000).

in that case and concerns the same underground parking garage.[6] The claim also involves essentially the same parties, and appellants could have broached the question of a monthly maintenance parking fee in *Taylor, supra*. Since they did not, the judgment in *Taylor* estops them from raising it in this case. Furthermore, even assuming that the appellees did not properly raise the *res judicata* defense, its application to this case did not constitute error. Although *"res judicata* is an affirmative defense that must be pleaded, not raised *sua sponte*," *Mowbray v. Cameron County, Texas,* 274 F.3d 269, 281 (5th Cir. 2001) (citation omitted), a trial court may raise *res judicata* grounds *sua sponte* "in the interest of judicial economy where, [as here,] both actions were brought before the same court." *Id.* (citing *Boone v. Kurtz,* 617 F.2d 435, 436 (5th Cir.1980) (other citation omitted)). Thus, we detect no error in the trial court's ruling, even if *sua sponte*, that appellants' claim for a monthly maintenance fee for underground parking is barred by the doctrine of *res judicata.*

The remaining point to be addressed concerns the relocation of appellees' access to the Carrollsburg underground parking spaces from the interior lobbies and elevators of the Carrollsburg Condominium to exterior ramps, and the appropriateness of this matter for summary judgment. The 1964 Accessory Parking Covenant did not explicitly provide for access to underground parking through the lobbies and elevators of the Carrollsburg Condominium. Nonetheless, the trial court determined that: "[T]he use of the lobbies and elevators of the high-rise apartment buildings for over thirty years is convincing evidence that entry to the garage via the lobbies and elevators was considered by all to be a reasonable use of and access to the easement despite the Covenant's lack of specific reference to the path of access."

We review the relocation of access issue *de novo*. We hold that the trial court did not err by concluding as a matter of law that the Carrollsburg Square owners were entitled to legal access to their underground parking spaces through the Carrollsburg Condominium lobbies and elevators because of an express easement. Approximately thirty-five years ago, the Court of Appeals of Maryland recognized that continuous use of a right of way, without opposition, may fix the location:

---

**6.** The 1964 Accessory Parking Covenant provided in pertinent part:

[I]n consideration of the special exception granted by the Board of Zoning Adjustment on the 22nd day of November, 1963, in Appeal No. 7518, and pursuant thereto, whereby permission was granted to establish accessory passenger automobile parking spaces for certain proposed apartment buildings to be constructed on [specified land], the said DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY and CARROLLSBURG SQUARE CORP., for themselves, and their successors and assigns, do hereby covenant to and with the District and its successors as follows:....
4. That the DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY and CARROLLSBURG SQUARE CORP. will, and by these presents agree to, provide ... legal access to and from the aforesaid accessory parking spaces in said underground garage [on specified property] for the use and convenience of occupiers, invitees and guests of the apartment buildings on the aforesaid [property] and legal ingress and egress to and from said accessory parking spaces in said underground garage for passenger automobiles of such occupiers, invitees and guests, and to keep said accessory parking spaces unobstructed and to maintain the same in a condition suitable for the purpose for which they are herein constituted.
Paragraph 5 of the Covenant specified that, "the covenants contained in paragraph[ ] 4 ... shall be construed as, [a] real covenant[ ] and shall run with the land...."

Where an easement in land, such as a way, is granted in general terms, without giving definite location and description of it, the location may be subsequently fixed by an express agreement of the parties, or by an implied agreement arising out of the use of a particular way by the grantee and acquiescence on the part of the grantor, provided the way is located within the boundaries of the land over which the right is granted. As otherwise expressed, it is a familiar rule that, when a right of way is granted without defined limits, the practical location and use of such way by the grantee under his deed acquiesced in for a long time by the grantor will operate to fix the location. The location thus determined will have the same legal effect as though it had been fully described by the terms of the grant.

*Taylor v. Solter,* 247 Md. 446, 231 A.2d 697, 701 (1967) (citation omitted). As we have determined previously, the 1964 Accessory Parking Covenant expressly conveyed to the Carrollsburg Square owners "legal access to and from the ... accessory parking spaces in [the Carrollsburg Condominium] ... underground garage ... and legal ingress and egress to and from [the] accessory parking spaces in [the] underground garage...." For some thirty years prior to appellants' relocation of the access route to the underground garage, appellees had continuous and unchallenged use of the lobbies and elevators within the Carrollsburg Condominium to gain access to the underground garage. Thus, under *Taylor v. Solter, supra,* 231 A.2d at 701, "an implied agreement arising out of [the use of the lobbies and elevators of the Carrollsburg Condominium] by the [appellees] and acquiescence on the part of the [appellants]" fixed the route of access to appellees' underground parking spaces. The majority rule in this country is that once an easement is fixed, neither the dominant estate, in this case appellees', nor the servient estate, here appellants', may unilaterally relocate the easement. As the Supreme Judicial Court of Maine has stated:

In the great majority of jurisdictions the rule is, that, once the location of an expressly deeded easement is established, whether by the language of the instrument creating the easement or by subsequent acts of the parties fixing on the ground the location of a general grant of a right of way, the site location may not be changed thereafter by either the owner of the dominant estate or the owner of the servient estate, unless both parties consent to the relocation, excepting, however, where the document creating the easement also contains an express or implied grant or reservation of power to relocate. Thus, in the absence of statutory provisions to the contrary, as a general rule, the location of an easement, when once established, cannot be changed or the easement relocated without the mutual consent of the owners of the dominant and servient estates.

*Davis v. Bruk,* 411 A.2d 660, 664 (Me.1980) (citations omitted); *see also Herren v. Pettengill,* 273 Ga. 122, 538 S.E.2d 735, 736 (2000) (rejecting "the adoption of a rule allowing the owner of the servient estate to relocate the easement under limited circumstances when it places no undue hardship on the owner of the dominant estate.");[7] Note, *The Right of Owners of*

---

7. The Supreme Court of Georgia explained its rationale for following the majority rule:

Foremost, it provides certainty in land ownership. Allowing unilateral avoidance of the contract by the owner of the servient estate not only would violate fairness principles, it also would create uncertainty in real property law by opening the door for increased litigation over "reasonableness" issues based on today's conditions rather

*Servient Estates to Relocate Easements Unilaterally,* 109 HARV. L.REV. 1693 (1996); F.M. English, Annotation, *Relocation of Easements (Other Than Those Originally Arising By Necessity); Rights As Between Private Parties,* 80 A.L.R.2d 743, 1961 WL 13063 (1961).

Some jurisdictions have adopted modified versions of the majority rule. For example, the Court of Special Appeals of Maryland follows the majority rule that: "A right-of-way may not be relocated without the consent of the owners of both the dominant and servient estates." *Everdell v. Carroll,* 25 Md.App. 458, 336 A.2d 145, 155 (Md.Ct.Spec.App.1975) (citation omitted). However, that case also recognized that a modification of the right-of-way could be made where it "was necessary for the useful and beneficial occupation of the land of the servient estate," unless the modification was prohibited by "the terms of the grant" of the easement or "interfere[d] with the reasonable use of the right-of-way by the dominant estate." *Id.* at 150; *see also Drolsum v. Luzuriaga,* 93 Md.App. 1, 611 A.2d 116, 124 (Md.Ct. Spec.App.1992) ("The court could reasonably conclude that gates at either end of the [easement] . . . unreasonably interfered with the dominant tenement owners' reasonable enjoyment of their easement.").[8]

In contrast to the Maryland approach, New York does not require the consent of both the servient and dominant estate before an easement may be modified. Rath-

er, New York follows an approach based upon a tentative draft of a restatement of the law of property (servitudes) rule:

> In the absence of a demonstrated intent to provide otherwise, a landowner, consonant with the beneficial use and development of its property, can move [the] right of way, so long as the landowner bears the expense of the relocation, and so long as the change does not frustrate the parties' intent or object in creating the right of way, does not increase the burden on the easement holder, and does not significantly lessen the utility of the right of way.

*Lewis v. Young,* 92 N.Y.2d 443, 682 N.Y.S.2d 657, 705 N.E.2d 649, 653–54 (1998) (referencing RESTATEMENT [THIRD] OF PROPERTY [SERVITUDES], Tentative Draft No. 4, § 4.8[3] ). *See also Marek v. Woodcock,* 277 A.D.2d 864, 716 N.Y.S.2d 812, 813 (N.Y.App.Div.2000) ("alteration . . . made solely for the purpose of making access more difficult . . . substantially interfered with . . . reasonable use and enjoyment of the right-of-way in light of the convenience to which [defendants] had become accustomed. . . ."). Another test has been applied by the Superior Court of New Jersey, Appellate Division, which "h[e]ld that a court may compel relocation of an easement to advance the interests of justice where the modification is minor and the parties' essential rights are fully preserved." *Kline v. Bernardsville Ass'n, Inc.,* 267 N.J.Super. 473, 631 A.2d 1263, 1267 (App.Div.1993).

---

than those considered in the original bargain. No doubt, when the servitude was first created both parties considered all market factors, including their respective costs and benefits, before agreeing on the consideration for the transaction. If the benefits of relocation become substantial enough, it is the market that should ultimately bring the parties together again, not the courts.

*Herren, supra,* 538 S.E.2d at 736.

**8.** Our decision in *Tanaka v. Sheehan,* 589 A.2d 391 (D.C.1991), which involved the construction of a fence or gate by the servient estate owners on the easement, cites and quotes *Everdell, supra. Tanaka, supra,* 589 A.2d at 395.

The tentative restatement draft rule on which the opinion in *Lewis, supra,* was based in part, has been adopted as § 4.8 of the RESTATEMENT OF THE LAW (THIRD) PROPERTY (SERVITUDES) (2000).[9] The introductory note to Chapter 4–Interpretation of Servitudes, states:

> Section 4.8(3) departs from the standard common-law rule to adopt the civil-law rule on relocation of easements. If necessary to permit normal use or development of the servient estate, and if changes can be made without any loss of utility to the easement owner, the servient-estate owner is entitled to make reasonable changes in the location or dimensions of an easement. The rule should lead to an increase in the aggregate utility of easement and servient estate, and complements the rule stated in § 4.10 that the easement owner may change the use of the servient estate over time to take advantage of developments in technology and to accommodate normal development of the dominant estate.

*Id.,* ch. 4 at 496. In a case involving the relocation of a ditch, the Supreme Court of Colorado affirmed a finding of trespass due to the alteration of an easement, but applied § 4.8(3) of the Restatement in declaring that:

> If a burdened owner seeks to move or alter a ditch easement and the benefitted owner refuses to consent, then the burdened owner may seek a declaratory determination from a court that the alteration does not damage the benefitted owner(s) in accordance with the Restatement test.

*Roaring Fork Club v. St. Jude's Co.,* 36 P.3d 1229, 1238 (Colo.2001). The court went on to hold, "that the owner of property burdened by a ditch easement has no right to move or alter the easement without consent of the benefitted owner unless he first obtains a declaration of a court that such alterations will cause no damage to the benefitted owner." *Id.* at 1239. *See also* Note, *Balancing the Equities: Is Missouri Adopting a Progressive Rule for Relocation of Easements?,* 61 Mo. L.REV. 1039 (1996).

In light of the foregoing, we conclude that under either the majority rule or that set forth in the Restatement, § 4.8(3), the Carrollsburg Condominium Association's position that it could relocate the easement cannot be sustained. Under the majority rule, the location of the access route to the underground garage had been fixed for some thirty years, and its unilateral relocation did not have the consent of the Carrollsburg Square owners. Thus, the relocation was invalid. Nor would the Carrollsburg Condominium Association at this point fare any better under § 4.8(3) of the Restatement. Besides the apparent failure to demonstrate that compelled use of the automobile entrance would not sig-

**9.** Section 4.8 provides:

Except where the location and dimensions are determined by the instrument or circumstances surrounding the creation of a servitude, they are determined as follows: (1) The owner of the servient estate has the right within a reasonable time to specify a location that is reasonably suited to carry out the purpose of the servitude. (2) The dimensions are those reasonably necessary for enjoyment of the servitude. (3) Unless expressly denied by the terms of an easement, ... the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not

(a) significantly lessen the utility of the easement,

(b) increase the burdens on the owner of the easement in its use and enjoyment, or

(c) frustrate the purpose for which the easement was created.

nificantly burden use of the easement, there is no showing that such a change is required in order "to permit normal use or development of the servient estate."

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*