*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 19-CV-0644 & 19-CV-1146

JOHN STEVEN MUDD, APPELLANT,

V.

OCCASIONS CATERERS, INC., ET. AL., APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(CAB-3840-19 & CAB-3274-18)

(Hon. Florence Y. Pan, Trial Judge)

(Argued February 4, 2021                    Decided December 23, 2021)

*Jeremy Greenberg*, with whom *Denise M. Clark* was on the brief, for appellant.

*Philip Zipin* for appellees.

Before GLICKMAN, BECKWITH, and EASTERLY, *Associate Judges*.

Opinion for the Court by *Associate Judge* GLICKMAN.

Concurring opinion by *Associate Judge* EASTERLY at page 27.

GLICKMAN, *Associate Judge*:  Appellant, John Steven Mudd, challenges the

trial court's award of summary judgment in favor of appellees on his claim arising

under the D.C. Wage Payment and Collection Law ("WPCL"),[1] as well as the court's denial of his motion to amend his complaint and its dismissal of his separately filed breach of contract action. We reverse in part and affirm in part.

## I.

Mr. Mudd was employed as the comptroller of appellee Occasions Caterers, Inc. ("Occasions") from April 8, 1999, until February 15, 2018. Occasions is a catering company whose CEO is appellee Mark Michael. Mr. Michael is also the President and 50% owner of appellee Protocol Staffing Services, Inc. ("Protocol"), which provides staff for events catered by Occasions.

Mr. Mudd worked for Occasions under a series of one-year contracts, executed in 2006, 2007, 2008, 2010, and 2013. He continued working for the company as its comptroller during the years for which he did not have a written employment agreement. Mr. Mudd's 2013 employment contract with Occasions, his last before he was terminated, specified his responsibilities as comptroller as follows:

---

[1] D.C. Code §§ 32-1301 *et seq.* (2019 Repl.).

> Oversee financial administration for the organization to include: management of accounting staff, processing accounts payable/receivable, payroll for full-time staff and independent contractors, financial reporting and forecasting, tracking sales and commissions, preparing production and administration budgets, processing sales and income tax, as well as special projects as assigned by the owners.

Like Mr. Mudd's prior employment agreements, the 2013 contract provided that his compensation would include a profit-sharing bonus ("PSB") amounting to 3.33% of Occasions' pre-tax earnings, to be "determined at the end of the [c]alendar year and paid by the end of February the following year." Mr. Mudd received the PSB each year from 2000 through 2016, regardless of whether or not he had a written employment contract for the corresponding year. In addition to his duties as comptroller of Occasions, Mr. Mudd performed off-site staffing work on behalf of Protocol, for which he was paid hourly.

In August 2017, Occasions hired Joseph Gwozdz to serve as its first chief financial officer ("CFO"). Approximately six months after Mr. Gwozdz's arrival, Occasions sent Mr. Mudd a termination letter. The letter informed him that his position would be "eliminated," effective February 15, 2018, and that he was entitled to twenty-six weeks of severance pay ($57,000), accrued paid time off ("PTO"), and

compensation for any hours worked through his last day of employment. The letter did not mention the PSB.

In May 2018, Mr. Mudd filed a complaint in Superior Court against Occasions, Protocol, and Mr. Michael.[2] The complaint alleged that the defendants violated D.C. Code § 32-1303(1)[3] by failing to pay Mr. Mudd (1) the 3.33% PSB, (2) the agreed-upon hourly rate for work that he performed on behalf of Protocol, and (3) his accrued PTO. The parties stipulated that the PSB for 2017, if it were owed, would be $75,794.00. Mr. Mudd later amended his complaint to add Compass Group USA, the successor in interest to Occasions and Protocol, as a defendant.

Following an initial discovery period, the parties filed cross-motions for summary judgment. Occasions and Protocol requested summary judgment on all of Mr. Mudd's claims, while Mr. Mudd asked for summary judgment on only his PSB

---

[2] Mr. Mudd's initial complaint also named Eric Michael and Sina Molavi as defendants, but both parties were later dismissed from the case without objection.

[3] This section provides that "[w]henever an employer discharges an employee, the employer shall pay the employee's wages earned not later than the working day following such discharge; provided, however, that in the instance of an employee who is responsible for monies belonging to the employer, the employer shall be allowed a period of 4 days from the date of discharge or resignation for the determination of the accuracy of the employee's accounts, at the end of which time all wages earned by the employee shall be paid."

and hourly rate claims. On April 30, 2019, the trial court held a hearing, at the close of which it granted summary judgment to the defendants on the PSB claim and to Mr. Mudd on the hourly rate claim,[4] but denied the defendants' motion for summary judgment on the PTO claim. With respect to the PSB claim, the trial court concluded that Mr. Mudd was not entitled to payment under § 32-1303(1) because the terms of his 2013 contract were no longer in effect once Occasions hired Mr. Gwozdz. The trial court reasoned that there was no genuine issue of material fact as to whether Mr. Gwozdz's hiring clearly and manifestly demonstrated that Occasions no longer wished to be bound by the 2013 contract. The trial court denied Mr. Mudd's subsequent motion to reconsider its summary judgment ruling.

At this point, the only issue that the trial court had not disposed of was Mr. Mudd's claim for accrued PTO. Prior to a second hearing in June 2019, Mr. Mudd filed a motion to amend his complaint, seeking to add a new count for breach of the 2013 employment contract. At the hearing, the trial court denied his motion. After the ruling, counsel for Occasions informed the trial court that Mr. Mudd had recently filed a separate breach of contract claim against his client in Superior Court. Mr. Mudd admitted that the breach of contract action was identical to the claim he had

---

[4] The trial court therefore denied Mr. Mudd's motion for summary judgment on the PSB claim.

unsuccessfully attempted to add to his existing complaint. The trial judge responded by issuing an order transferring the new breach of contract case to her own docket and dismissing it with prejudice *sua sponte* "because it is barred by the doctrines of res judicata and claim preclusion."[5] Between June and October 2019, the trial court dealt with several motions filed by Compass Group USA. On October 31, 2019, all of the parties stipulated to the dismissal of the accrued PTO claim that was still pending. Thus, in November 2019, the trial court entered a final judgment in the case.

Mr. Mudd then took this appeal. In it he contends the trial court erred by (1) granting summary judgment for the defendants on his PSB claim and denying his own motion for summary judgment on that claim; (2) denying him leave to amend

---

[5] Before issuing the written order, the judge explained to Mr. Mudd from the bench that his new complaint was "really not appropriate" because "[y]ou've had an opportunity to raise all of these issues, and you cannot clog up the court's docket with additional filings related to the same matter that has been fully briefed and litigated. . . . [R]es judicata includes claims that should have been brought based on the same facts and this is a claim that should have been brought based on the same facts. . . . You could have brought that claim in the context of the case that we've just finished and resolved. You cannot bring a new case based on the same facts. It's very straightforward and plain and simple. That's really not appropriate . . . especially after filing a motion to file an amended complaint in my case[,] having it denied, and then you go and file another case." And "for the record," the judge added, "what I'm trying to avoid here is a needless additional round of litigation where this case gets assigned to one of my colleagues."

his complaint to add a claim for breach of his 2013 employment contract; and (3) dismissing his breach of contract action.

## II.

### A.

We review entitlement to summary judgment *de novo*, applying the same standard as the trial court.[6] The threshold for summary judgment is well-established:

> A party is entitled to summary judgment if, when the facts are viewed "in the light most favorable to the non-moving party . . . there [are] no genuine issue[s] of material fact and [] the moving party is entitled to judgment as a matter of law." On appeal, this court is required to "conduct an independent review of the record . . . [to] determine whether any relevant factual issues exist by examining and taking into account the pleadings, depositions, and admission, along with any affidavits on file, construing such material in the light most favorable to the party opposing the motion."[7]

---

[6] *Aziken v. District of Columbia*, 194 A.3d 31, 34 (D.C. 2018).

[7] *Id.* (internal citations omitted).

As an appellate court, "[o]ur role 'is not to act as factfinder and to resolve factual issues,' but rather to review the record to determine if there is 'a genuine issue of material fact on which a jury could find for the non-moving party.'"[8]  If such a dispute of material fact exists, then summary judgment is not appropriate, and an award of "summary judgment must be reversed."[9]

**B.**

Occasions' main argument for affirmance of summary judgment on Mr. Mudd's PSB claim is that he was not entitled to receive the PSB because his 2013 employment contract expired in August 2017 when Occasions hired Mr. Gwozdz to serve as the company's chief financial officer.  Occasions relies on the principle that:

> [W]hen a contract lapses but the parties to the contract
> continue to act as if they are performing under a contract,
> the material terms of the prior contract will survive intact

---

[8]  *Onyeoziri v. Spivok*, 44 A.3d 279, 283 (D.C. 2012) (quoting *Holland v. Hannan*, 456 A.2d 807, 814 (D.C. 1983)).

[9]  *Id.* at 284 (internal quotation marks omitted).  "Normally, denials of summary judgment are not appealable since they are not final judgments." *Kuder v. United Nat'l Bank*, 497 A.2d 1105, 1108 (D.C. 1985).  We have recognized a narrow exception to that general rule where the grant of summary judgment to the opposing party constitutes a final judgment in the case, the merits of the opposing motions are intertwined, and the contested issue is one of law.  *See id.* (citing *Stewart v. United States*, 186 F.2d 627, 634 (7th Cir. 1951), and Annot., 15 A.L.R. 3d 899, 925 (1967)).

*unless either one of the parties clearly and manifestly indicates, through words or conduct, that it no longer wishes to continue to be bound thereby*, or both parties mutually intend that the terms not survive.[10]

Occasions argues that, by hiring Mr. Gwozdz in August 2017, it clearly manifested its intention not to be bound by the terms of its 2013 contract with Mr. Mudd.[11]  This is so, they argue, because Mr. Gwozdz assumed Mr. Mudd's "primary job responsibility" of overseeing financial administration for Occasions.  According to Occasions, "[t]his fact is not in dispute, and it is dispositive of [Mr. Mudd's] claim that any profit-sharing compensation was due."

Mr. Mudd counters that Mr. Gwozdz's hiring did not clearly and manifestly indicate that Occasions no longer wished to be bound by the 2013 contract because

---

[10]  *Hahn v. Univ. of the District of Columbia*, , 1258 (D.C. 2002) (emphasis added) (quoting *Luden's Inc. v. Local Union No. 6, Bakery, Confectionary & Tobacco Workers' Int'l Union*, 28 F.3d 347, 355–56 (3rd Cir. 1994)); *see also, e.g.*, *Vogel v. Washington Metro. Transit Auth.*, 533 F.2d 13, 15–16 (D.C. Cir. 1976) ("It is widely accepted that where parties enter into a contract of employment for a term of one year, and then continue the relationship without a new agreement, they are presumed to have renewed the original contract for another year."); 27 AM. JUR. 2D EMPLOYMENT RELATIONSHIP § 50 ("Where an employee continues to work for an employer after the termination of an employment contract in which the period of time is specified, then there is an implied agreement to continue the rate of compensation set forth in the original contract.").

[11]  *See Rogers v. Advance Bank*, 111 A.3d 25, 27 (D.C. 2015) ("The burden rests with the moving party to prove that there is no genuine issue of material fact").

(1) he was never told the hiring would affect his own position, (2) he retained his title of comptroller for Occasions, and (3) he continued to perform the same duties. Mr. Mudd maintains that the "only change to [his] position as a result of the hiring was that he now reported to Mr. Gwozdz instead of Mr. Michael."

The trial court agreed with Occasions. It explained its reasoning as follows:

> I don't think that there is a genuine issue of material fact here because . . . the most important duty that Mr. Mudd had as comptroller was to oversee the financial administration of the organization. . . . And I don't think there's any genuine issue of material fact as to whether there's a manifest and clear intent to change the contract if they take away his key function and give it to somebody else . . . I just don't think that there's a jury question here. There's no dispute as to this fact that Mr. Gwozdz was hired in August of 2017. There's no dispute as to his title which was chief financial officer. And there's no dispute that Mr. Gwozdz *took over the oversight of the financial administration of the organization and the management of the accounting staff.* In light of that I just don't see a genuine issue of material fact that there wasn't a manifest and clear intent to change this 2013 contract and no longer be bound by it. (Emphasis added.)

Based on our review of the record, however, we reach a different conclusion. We think the trial court identified good reasons why Mr. Mudd was not entitled to summary judgment. A jury weighing the evidence reasonably *might* conclude that, with the hiring of Mr. Gwodz and consequent *de facto* demotion of Mr. Mudd, the

handwriting on the wall was plain enough to display Occasions' clearly manifested intent to terminate its 2013 employment contract with him. However, that does not mean Occasions was entitled to summary judgment. Just because a jury reasonably *could* find that Occasions clearly manifested its intent to terminate Mr. Mudd's contract does not mean the jury reasonably could not find the opposite. We think there is sufficient dispute about the material facts bearing on this issue to preclude granting summary judgment for either side.

While it is undisputed that Mr. Gwozdz took over Mr. Mudd's primary duty under that contract to oversee the financial administration of Occasions, that was not Mr. Mudd's *only* duty, and it is not clear on this record exactly how Mr. Gwozdz's hiring impacted his other responsibilities for the six months Mr. Mudd continued working at Occasions. And there is no dispute that Mr. Mudd's title, comptroller, remained unchanged, and that he was never told that Mr. Gwozdz's hiring marked the end of his contract with Occasions or affected its terms.

In his deposition, Mr. Michael acknowledged that after August 2017, Mr. Mudd "was still in the department and . . . still working." Although Mr. Michael said that at this point Mr. Mudd was no longer overseeing financial administration, managing accounting staff, tracking sales, or preparing budgets, he thought that Mr.

Mudd was still handling "some of" the accounts payable or receivable, and he could not recall whether Mr. Mudd remained in charge of payroll, processing sales/income tax, or any special projects. When asked whether Mr. Mudd's duties changed after he started reporting to Mr. Gwozdz, Mr. Michael responded, "I'll say I believe they did but I'm not exactly sure how they changed." He added that he was "fairly certain" Mr. Gwozdz had Mr. Mudd "doing different things than I had him doing," but admitted that he never discussed with Mr. Mudd how his concrete duties or compensation would change as a result of Occasions acquiring a CFO, and that Mr. Mudd retained the title of comptroller until he was terminated. At most, Mr. Michael remembered "a number of conversations" with Mr. Mudd "about the fact that . . . he would report to the CFO" instead of to Mr. Michael. Finally, Mr. Michael stated in a signed affidavit that the recruitment of Mr. Gwozdz as CFO "placed a significant financial burden on Occasions because Occasions had to employ and pay two people [i.e., Mr. Mudd and Mr. Gwozdz] to perform essentially the same job."

As for Mr. Mudd, he asserted that when Mr. Gwozdz was hired, "what I was originally told is . . . I would run accounting and Joe would oversee the greater picture of all financial matters." Mr. Mudd agreed that he began reporting to Mr. Gwozdz instead of Mr. Michael, and that Mr. Gwozdz took over "some of" his

functions, but he stated that he remained in charge of payroll, accounts receivable, "financial statement reporting[,] and general ledger work" until his termination.

Viewing the evidence described above in the light most favorable to Mr. Mudd, we think the facts would permit a reasonable juror to find that Occasions did not *clearly and manifestly* indicate through its conduct that it no longer wished to be bound by the 2013 contract.[12]  Occasions has not pointed us to any authority holding that an employer's *sub silentio* reassignment of some of an employee's duties alone demonstrates, as a matter of law, the employer's desire to walk away from its obligations under a contract (and we are not aware of any).[13]  Nor has it proffered any testimony from Mr. Gwozdz (or any other company witness) clarifying what Mr. Mudd's duties were after Mr. Gwozdz arrived or how those duties compared with his former duties.  By the same token, though, viewing the evidence in the light

---

[12]  *See Manifest,* THE AMERICAN HERITAGE DICTIONARY (5th ed. 2020) ("Clearly apparent to the sight or understanding; obvious."); *Clear*, THE AMERICAN HERITAGE DICTIONARY (5th ed. 2020) ("Plain or evident to the mind; unmistakable; [f]ree from doubt or confusion; certain.").

[13]  *Cf. Luden's Inc.*, 28 F.3d at 356–57 (holding that the arbitration clause of an expired Collective Bargaining Agreement remained enforceable where "neither party clearly notified the other . . . that it was unilaterally revoking or repudiating the arbitration provision so well established between the parties . . . [and] the record d[id] not reveal that the parties disagreed about the continuation of the arbitration procedure . . . in any meaningful way").

most favorable to Occasions, we also think the facts of record so far would permit (albeit not require) a reasonable juror to find that it *did* clearly and manifestly indicate that the 2013 employment contract was abrogated. In short, given the factual fuzziness in the record, we think this issue is one for a jury to resolve.[14]

**C.**

Occasions has a backup argument: it contends that Mr. Mudd is not entitled to the PSB because the PSB does not qualify as "wages" the Wage Payment and Collection Law requires an employer to pay an employee upon discharge. This argument raises a question of statutory interpretation, which we review *de novo*.[15]

Section 32-1301(3) of the WPCL states that the term "wages" encompasses "all monetary compensation after lawful deductions, owed by an employer, whether

---

[14] *See Phenix-Georgetown, Inc. v. Chas. H. Tompkins Co.*, 477 A.2d 215, 221 (D.C. 1984) ("The party opposing the motion [for summary judgment] need only show that there is sufficient evidence supporting the claimed factual issue to require a jury to resolve the parties' differing versions of the truth."); *see also* 19 WILLISTON ON CONTRACTS § 54:8 (4th ed.) ("The intent of the contracting parties, and thus the existence of an implied contract, is normally a question of fact for the jury, and the determination whether there is an implied employment contract generally requires a factual inquiry . . . .").

[15] *Eaglin v. District of Columbia*, 123 A.3d 953, 955 (D.C. 2015).

the amount owed is determined on a time, task, piece, commission, *or other* basis of calculation" (emphasis added), specifically including "(A) Bonus" and "(E) Other remuneration promised or owed . . . [p]ursuant to a contract for employment, whether written or oral[.]" That definition plainly encompasses the PSB provided for in Mr. Mudd's 2013 contract. A separate provision of the WPCL, § 32-1303(1), provides in pertinent part that "[w]henever an employer discharges an employee, the employer shall pay the employee's wages earned not later than the working day following such discharge[.]"

Occasions argues that the PSB did not qualify as wages it was obliged to pay Mr. Mudd under these provisions because (a) the bonus was not tied to his specific work performance and (b) the amount of the bonus was not yet determined at the time he was fired. Neither argument is persuasive.

First, the WPCL does not say that a bonus will be considered a wage only if it is based on an employee's individual work performance (as opposed, in this case, to a fixed share of the employer's yearly earnings). As the trial court noted, such a limitation is inconsistent with the "very broad" statutory definition of wages. The definition of wages quoted above states that they include "all monetary compensation after lawful deductions, owed by an employer, whether the amount

owed is determined on a time, task, piece, commission, *or other basis of calculation*." And in *Sivaraman v. Guizzetti & Assocs., Ltd.*, this court specifically rejected an argument that a bonus did not constitute "wages" under the WPCL because it was not "money paid for work or a service."[16] As we explained, the Council expanded the WPCL's definition of wages in 2013 by adding the word "all" before "monetary compensation" and by "deleting the [prior] restrictive 'for labor or services rendered' language and replacing it with a host of monetary benefits that are, at least sometimes, not directly tied to labor or services rendered," including bonuses.[17] Our interpretation of the statutory language in *Sivaraman* is fatal to Occasions' claim that only bonuses linked to an employee's work performance are covered.

---

[16] 228 A.3d 1066, 1073 (D.C. 2020).

[17] *Id.* at 1074 & n.9. The compensation at issue in *Sivaraman* was a $2,000 moving stipend. We said:

> [The employee] could have spent no money whatsoever to relocate, and he still would have been entitled to this $2,000 lump sum simply for accepting the offer of employment and starting his job. For that reason, *the stipend might just as easily be referred to as a signing bonus, and bonuses are expressly contemplated as wages under the WPCL*, D.C. Code § 32-1301(3).

*Id.* at 1073 (emphasis added).

Second, the fact that Mr. Mudd's bonus for 2017 remained to be calculated when he was terminated in February 2018 does not mean he had not yet "earned" it within the meaning of § 32-1303(1). The 2013 contract provided that Mr. Mudd would receive 3.33% of Occasions' yearly pre-tax earnings, to be "determined at the end of the [c]alendar year and paid by the end of February the following year." If a jury determines that Occasions was still bound by the terms of that contract up until it discharged Mr. Mudd, that will mean he did "earn" this bonus for the year 2017. And since that bonus would have been calculated based on Occasions' 2017 pre-tax earnings, its amount was not speculative or indeterminate even if Occasions had yet to compute it. Occasions has not suggested otherwise; its only stated reason for not having computed Mr. Mudd's 2017 bonus by the time of his discharge in February 2018 is that "[h]istorically, bonuses for the preceding year were not calculated and paid until March." The mere fact that Occasions did not perform its employee bonus calculations until a couple months into the year is no reason to deny Mr. Mudd his contractual and statutory rights to what he earned. Occasions admits that if Mr. Mudd had not been discharged, he would have been entitled to a bonus in the amount $75,794.00.[18] We therefore reject the argument that Mr. Mudd's PSB was not "earned" and "owed" at the time of his termination.

---

[18] In that respect, this is not a case like *Bartolo v. Whole Foods Market Grp.*, 412 F.Supp.3d 35 (D.D.C. 2019), where the court held that, because the fired employee's bonus was linked to the employer's performance and that performance

Accordingly, we reverse the award of summary judgment to appellees on Mr. Mudd's PSB claim.

## III.

Next, we turn to Mr. Mudd's claims that the trial court erred by denying him leave to amend his complaint and by dismissing his separate breach of contract action on res judicata grounds.

## A.

We review the denial of a motion to amend for abuse of discretion.[19] The trial court rejected Mr. Mudd's request to add a breach of contract claim to his complaint based on its determinations that (1) the motion was untimely "in light of the . . . fact that the Court has already ruled on summary judgment and denied a motion for reconsideration," (2) the motion might require reopening discovery "and it's way

---

did not justify the payment of any bonus at all, the employee had not "earned" this sum. *Id.* at 50–51 (explaining that "Plaintiff would not have been entitled to a bonus even if he had remained at the company").

[19] *Harnett v. Washington Harbour Condo. Unit Owners' Ass'n*, 54 A.3d 1165, 1175–76 (D.C. 2012).

too late in the game for that," and (3) "[a]ll [of] the facts that underlie the request" "were known to [Mr. Mudd] in advance of the rulings on the motion for summary judgment."

This court has previously laid out the proper factors to consider for denying leave to amend: "(1) the number of requests to amend made by the movant; (2) the length of time the case has been pending; (3) bad faith or dilatory tactics on the part of the movant; (4) the merit of the proffered pleading; and (5) prejudice to the nonmoving party."[20] Although "lengthy delay, standing alone, is usually not sufficient reason for the trial court to deny a motion to amend,"[21] we have upheld delay-based denials where "the moving party fails to state satisfactory reasons for the tardy filing and if the granting of the motion would require new or additional discovery."[22] More specifically, "[w]e have concluded that a trial court properly

---

[20] *Taylor v. District of Columbia Water & Sewer Auth.*, 957 A.2d 45, 51 (D.C. 2008) (internal quotation marks omitted).

[21] *Id.* (quoting *Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 120 (D.C. 1992)).

[22] *Harnett*, 54 A.3d at 1176 (quoting *Coulter v. Gerald Family Care, P.C.*, 964 A.2d 170, 183 (D.C. 2009)).

denied a party's motion to amend as tardy where the party had all the necessary facts to state the new claims it seeks to assert at the time it filed its previous complaint."[23]

Applying these principles to the trial court's analysis, we cannot say that it abused its discretion in this case. Discovery was closed, the litigation had been ongoing for over a year, summary judgment had already been granted or denied on all of Mr. Mudd's claims (save for the one concerning his accrued PTO), and the trial court had rejected a motion to reconsider.[24] Mr. Mudd does not dispute that the new breach of contract claim relied on facts that were fully available to him earlier on in the proceedings, and he was unable to provide the trial court with a substantive

---

[23] *Id.* (internal quotation marks omitted) (quoting *Flax v. Schertler*, 935 A.2d 1091, 1105 (D.C. 2007)).

[24] *See Molovinsky v. Monterey Co-op., Inc.*, 689 A.2d 531, 534–35 (D.C. 1996) (finding no abuse of discretion where trial court rejected appellant's motion to amend because "[b]y the time plaintiff made his motion to amend, *discovery had been completed, summary judgment had been granted on the contract claim*, and it appeared that the [statute of limitations] would foreclose the discrimination claim. The timing of the motion, filed only after defeat seemed imminent, was suggestive of an unacceptable dilatory approach.") (emphasis added); *Edwards v. Safeway Inc.*, 216 A.3d 17, 19 (D.C. 2019) (same, where the case had been pending for eighteen months, the motion was filed after the close of discovery, the addition of the new claims "would have required [defendant] to provide significant discovery," and the movant "did not provide an explanation for the lateness of the request"); *Good Food Servs., Inc.*, 608 A.2d at 121–22 (same, where the case was a year and a half old and the trial court found that the movant "had all the necessary facts to state [the new] claim at the time it filed its third party complaint").

explanation for why this claim was not included in his initial complaint.[25]  Contrary to Mr. Mudd's position on appeal, the trial court did not rely exclusively on the lateness of his motion in dismissing it.  Rather, it noted that Mr. Mudd had all the necessary facts by the time he filed his motion for summary judgment, and it expressed concern that "we would probably need discovery" to properly develop appellant's new legal theory.  Under our case law, these reasons were sufficient to support the trial court's denial of Mr. Mudd's motion to amend.

**B.**

Finally, Mr. Mudd argues that the trial court erred in dismissing his separately filed breach of contract action with prejudice on the ground that it was barred by res judicata.

A trial court "may raise res judicata grounds *sua sponte* in the interest of judicial economy where, [as here,] both actions were brought before the same

---

[25]  When the judge asked, "why didn't you just argue in the alternative for breach of contract to begin with?" Mr. Mudd's trial counsel replied, "we were prosecuting the case . . . under the D.C. Wage Statute but . . . just in light . . . of the Court's ruling about . . . how the Court saw the case, that's why we sought to leave to amend."  The "ruling" in question was the trial court's offhand statement in its order rejecting Mr. Mudd's motion to reconsider that the case might be "better viewed as a breach of . . . contract [dispute]."

court."[26]  Whether the trial court properly applied res judicata is a legal question that we review *de novo*.[27]  Under that doctrine, also known as claim preclusion, "a final judgment on the merits 'embodies all of a party's rights arising out of the transaction involved,' and precludes relitigation in a subsequent proceeding of all issues arising out of the same cause of action between the same parties."[28]  "[A] judgment estops not only as to every ground of recovery or defense actually presented in the action, but also as to every ground which might have been presented[.]"[29]

Mr. Mudd concedes that his breach of contract action is based on the exact same facts underlying his WPCL action and asserts a ground that he might have presented in that action.  He argues that the trial court's application of res judicata to dismiss his breach of contract case was improper, and must be reversed, because

---

[26]  *Threatt v. Winston*, 907 A.2d 780, 782 (D.C. 2006) (alteration in original) (quoting *Carrollsburg v. Anderson*, 791 A.2d 54, 60 (D.C. 2002)).

[27]  *Carrollsburg*, 791 A.2d at 58 (quoting *Shin v. Portals Confederation Corp.*, 728 A.2d 615, 618 (D.C. 1999)).

[28]  *Carr v. Rose*, 701 A.2d 1065, 1070 (D.C. 1997) (internal citation omitted) (quoting *Stutsman v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc.*, 546 A.2d 367, 370 (D.C. 1988)).

[29]  *Smith v. Greenway Apartments LP*, 150 A.3d 1265, 1272–73 (D.C. 2016) (alterations in original) (quoting *Henderson v. Snider Bros., Inc.*, 439 A.2d 481, 485 (D.C. 1981)).

it preceded "[t]he crucial element of *res judicata* . . .[,] a final judgment on the merits."[30]

Inasmuch as there was no final judgment at the time the court ruled and dismissed Mr. Mudd's breach of contract case, we must agree with him that the court made a mistake in resting its ruling on res judicata. Although the dismissal of Mr. Mudd's breach of contract case eventually was followed by a final judgment in the WPCL case, our reversal of that judgment in this opinion means there is still no final judgment to estop a second action.[31]

This does not necessarily mean the court improperly dismissed Mr. Mudd's breach of contract case, for the grounds the court relied on could have supported

---

[30] *Shin*, 728 A.2d at 618.

[31] There is case law holding that "denial of leave to amend constitutes res judicata on the merits of the claims which were the subject of the proposed amended pleading." *King v. Hoover Grp., Inc.*, 958 F.2d 219, 222–23 (8th Cir. 1992); *see also Arrigo v. Link*, 836 F.3d 787, 799 (7th Cir. 2016); *Hatch v. Trail King Indus.*, 699 F.3d 38, 45–46 (1st Cir. 2012); *Landscape Props. v. Whisenhunt*, 127 F.3d 678, 683 (8th Cir.1997); *Huck v. Dawson*, 106 F.3d 45, 49–50 (3d Cir. 1997); *Johnson v. SCA Disposal Servs.*, 931 F.2d 970, 974–76 (1st Cir.1991). However, absent a final judgment terminating the entire proceeding, the denial of leave to amend in this case was (and still is) subject to reconsideration by the trial court. *See Brady v. UBS Fin. Servs.*, 538 F.3d 1319, 1327 (10th Cir. 2008) (holding that breach of contract claims asserted in second suit were not barred by the doctrine of res judicata because the trial court could go back and revisit its denial of a motion for leave to amend the complaint in the first suit before the entry of final judgment in that suit).

dismissal on another basis — namely, the rule against claim-splitting. In this jurisdiction, "the rule is well settled that a single or entire claim or demand cannot be split up and divided into separate claims, and separate suits maintained for the various parts thereof."[32] Invocation of the claim-splitting rationale was committed to the discretion of the trial court, reviewable for abuse, and did not require a final judgment in the WCPL case.[33]

As the Tenth Circuit has explained, "[w]hile it is correct that a final judgment is necessary for traditional claim preclusion analysis, it is not required for the purposes of claim-splitting."[34] This difference reflects the partially different interests served by the doctrines of claim splitting and res judicata. Although "claim splitting and res judicata both serve the same interests of promoting judicial economy and shielding parties from vexatious concurrent or duplicative litigation[,] . . . claim splitting is more concerned with the [trial] court's comprehensive management of its docket, whereas res judicata focuses on protecting the finality of

---

[32] *Astor Pictures Corp. v. Shull*, 64 A.2d 160, 161 (D.C. 1949).

[33] *See generally* Wright, Miller & Cooper, *Federal Practice and Procedure* § 4406.

[34] *Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011).

judgments."[35] Given that concern, "a motion to dismiss based on improper claim-splitting need not — indeed, often cannot — wait until the first suit reaches final judgment."[36] Accordingly, "the test for claim splitting is not whether there is finality of judgment, but whether the first suit, *assuming it were final*, would preclude the second suit."[37]

This test for claim splitting is applicable where, as in the present case, a plaintiff seeks to pursue claims in a second suit after being denied leave to add those claims belatedly in the first suit.[38] If "[t]he proper question is whether, assuming the

---

[35] *Id.*

[36] *Id.* (quoting *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 987 n.1 (10th Cir. 2002)).

[37] *Id.* (emphasis added). "This makes sense," the court elaborated, "given that the claim-splitting rule exists to allow district courts to manage their docket and dispense with duplicative litigation. If the party challenging a second suit on the basis of claim splitting had to wait until the first suit was final, the rule would be meaningless." *Id.* at 1218-19.

[38] *See, e.g.*, *Northern Assur. Co. of America v. Square D Co.*, 201 F.3d 84, 87–88 (2d Cir. 2000) ("[I]n the typical situation where . . . the plaintiff is seeking to add additional claims against the same defendant and leave to amend is denied without reaching the merits of the claim[,] . . . claim preclusion is appropriate . . . based on the requirement that the plaintiff must bring all claims at once against the same defendant relating to the same transaction or event." (internal citations, quotation marks, and emphasis omitted)); *In re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Matsushita Elec. Indus. Co.*, No. MDL 765 PHX RCB, 1991 WL 425379, at *2 (D. Ariz. Jan. 7, 1991) ("The rule [against splitting a cause of action] prohibits a plaintiff from prosecuting its case piecemeal. Whether a plaintiff will be

first suit was already final, the second suit would be precluded under res judicata analysis,"[39] we think it would have been well within the trial court's discretion to dismiss Mr. Mudd's breach of contract complaint on a claim-splitting rationale. But for the fact that the court had not yet entered a final judgment in the first suit, it appears the preconditions for applying claim preclusion were met, and the court also explicitly relied, in part, on the docket management concerns that underlie the rule against splitting claims. However, the fact remains that the court did not expressly rely on that rule, nor was it asked to do so. Moreover, the parties have yet to address application of the rule against claim-splitting directly, either in the trial court or on appeal. We therefore deem it appropriate, at this time, to decline to affirm the dismissal on this basis. Instead, we vacate the dismissal and leave it to the court on

---

allowed to refile claims it was prevented from adding to a prior lawsuit depends upon whether refiling would frustrate the policies underlying the res judicata doctrine: relieving parties of the cost and vexation of multiple lawsuits, conserving judicial resources, preventing inconsistent decisions and encouraging reliance on judicial decisions. A decision denying leave to amend that was based on prejudice to the defendants and dilatoriness in bringing the claims plaintiff sought to add are the sort of grounds that should bar bringing those claims in a later action.") (internal citations omitted)).

[39] *Katz*, 655 F.3d at 1219.

remand to exercise its discretion and decide whether to dismiss the second suit for violation of the rule against claim-splitting.[40]

## IV.

For the aforementioned reasons, we reverse the trial court's grant of summary judgment in favor of appellees as to the PSB claim, affirm the court's denials of appellant's motions for summary judgment and for leave to amend his complaint, vacate the court's dismissal of appellant's breach of contract suit, and remand for further proceedings consistent with our opinion.

EASTERLY, *Associate Judge*, concurring: I concur in full in the opinion with one exception: I would end the discussion in III.B. with our determination that the trial court erred in dismissing Mr. Mudd's separately-filed breach of contract action with prejudice on the ground that it was barred by res judicata. I would not at this juncture raise sua sponte the distinct rule against claim splitting and discuss how this discretionary tool for docket management either might have been or might still be a basis for the Superior Court to dismiss Mr. Mudd's contract claim. *See Katz v.*

---

[40] In so doing, we do not rule out the possibility that other grounds may exist for dismissing the second suit. We note that in the event the court first enters a final judgment in the first suit, res judicata may then be applicable.

*Gerardi*, 655 F.3d 1212 (10th Cir. 2011) (explaining the ways in which claim splitting, or "the rule against duplicative litigation" is related to but distinct from res judicata, including that its invocation is subject to abuse of discretion review). As the majority opinion acknowledges, the rule against claim splitting has never played a role in this case: it was not the basis of the trial court's dismissal ruling or the subject of the parties' arguments "either in the trial court or on appeal." *Ante* at 26. Moreover, now that Mr. Mudd's contract claim has been unified with his revived PSB claim, it is unclear to me how the concerns regarding claim-splitting might apply to this case on remand. Indeed, none of the cases we cite regarding claim splitting involve a scenario such as this one where the trial court took the initiative to unify with the first claim a related but separately filed second claim, then incorrectly dismissed both of them, and was reversed on appeal.